**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
             *Plaintiff-Appellee,*

v.

STATE OF WASHINGTON; SWINOMISH
TRIBAL COMMUNITY; NISQUALLY
INDIAN TRIBE; PORT GAMBLE
S'KLALLAM TRIBE; LOWER ELWHA
BAND OF KLALLAMS; JAMESTOWN
S'KLALLAM TRIBE; SKOKOMISH
INDIAN TRIBE; MAKAH INDIAN
TRIBE; NOOKSACK INDIAN TRIBE OF
WASHINGTON STATE; UPPER SKAGIT
INDIAN TRIBE; LUMMI NATION,
             *Defendants-Appellees.*

SAMISH INDIAN TRIBE,
        *Applicant in Intervention-*
                      *Appellant.*

No. 03-35145

D.C. No.
CV 70-9213 BJR

OPINION

Appeal from the United States District Court
for the Western District of Washington
Barbara Jacobs Rothstein, District Judge, Presiding

Argued and Submitted
May 3, 2004—Seattle, Washington

Filed January 6, 2005

Before: A. Wallace Tashima, Richard A. Paez, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Tashima;
Dissent by Judge Bea

107

## COUNSEL

Craig J. Dorsay, Portland, Oregon, for appellant Samish Indian Tribe.

Elizabeth Ann Peterson, U.S. Department of Justice, Environment & Natural Resources Division, Washington, D.C., for appellee United States.

Daniel A. Raas, Raas, Johnsen & Stuen, Bellingham, Washington, for appellees Lummi Nation, Swinomish Indian Tribal Community, Upper Skagit Indian Tribe, Tulalip Tribe, Suquamish Indian Tribe, Port Gamble S'Klallam Tribe, Lower Elwha Band of S'Klallams, Jamestown S'Klallam Tribe, and Puyallup Tribe of Indians.

## OPINION

TASHIMA, Circuit Judge:

Appellant Samish Indian Tribe ("the Samish") sought by means of Federal Rule of Civil Procedure 60(b)(6) to reopen *United States v. Washington*, 476 F. Supp. 1101 (W.D. Wash. 1979) ("*Washington II*"), *aff'd* 641 F.2d 1368 (9th Cir. 1981), a judgment that denied the Samish treaty fishing rights on the ground that the tribe had not maintained an organized tribal structure. The Samish argued that federal recognition[1] of their tribe in 1996 was an extraordinary circumstance that justified reexamining their treaty fishing rights. The district court denied the motion to reopen, holding that federal recognition is of limited relevance to the Samish's treaty fishing rights, that the 1979 judgment was not erroneous, and that reopening the judgment would be extremely disruptive. We reverse.

## BACKGROUND

In 1855, federal representatives in the Territory of Washington induced a number of Indian tribes to relinquish much of their land in return for payments and the right to keep small parcels of land. *See generally Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 661-62 (1979). The resulting treaties also preserved the tribes' right to fish "at usual and accustomed grounds." *See, e.g.*, Treaty of Point Elliott, Jan. 22, 1855, 12 Stat. 927, 928.

A century later, however, runs of fish had become scarce and Native Americans took only a small fraction of the fish harvest. In 1970, the United States brought an action against the State of Washington to force it to protect the tribes' shares of anadromous fish runs. The United States brought the action

---

[1]"Federal recognition" is a process by which the United States government formally acknowledges a government-to-government relationship with a historic tribe. *See* 25 C.F.R. §§ 83.2, 83.12 (2003).

on its own behalf and as trustee for seven Indian tribes. Another seven tribes successfully intervened in the action. *United States v. Washington*, 384 F. Supp. 312, 327 & nn.1-2 (W.D. Wash. 1974), *aff'd*, 520 F.2d 676 (9th Cir. 1975) ("*Washington I*"). The district court ruled that all 14 tribes had fishing rights under various treaties, including the Treaty of Point Elliott, *id.* at 359-82, and that treaty tribes had a right to 50 percent of the harvestable fish passing through their traditional off-reservation fishing grounds. *Id.* at 343.

After the issuance of the decision in *Washington I*, the Samish intervened to assert fishing rights under the Treaty of Point Elliott. The district judge referred the matter to a magistrate judge, sitting as a special master. After a five-day hearing, the special master found that the Samish were not recognized as an Indian tribe by the United States government and "have not lived as a continuous separate, distinct and cohesive Indian cultural or political community." The special master therefore concluded that the Samish "at this time" were neither a treaty tribe nor a political successor to a treaty tribe and "presently" did not hold treaty fishing rights. The Samish appealed the special master's ruling to the district court, which held a de novo evidentiary hearing. The district court concluded that the Samish were not entitled to treaty fishing rights. *Washington II*, 476 F. Supp. at 1106.

In arriving at this conclusion, the district court adopted and relied on findings of fact proposed by the United States. Those findings concerned the Samish's lack of an organized tribal structure, and included the following:

- The Samish Tribe "exercises no attributes of sovereignty over its members or any territory."

- It is not recognized by the United States as a tribe.

- Neither its organization nor its membership has been recognized by the Congress or the Department of the Interior for Indian affairs purposes.

- The Secretary of the Interior has not prepared an official membership roll for the tribe.

- "There is no requirement of specific minimum blood quantum either as to Samish blood in particular or Indian blood in general."

- Many tribe members "are of only 1/16th degree Indian blood" and "[t]wo have only 1/32nd Samish blood."

- "The tribe does not prohibit dual membership and at least one member is an officer of the Lummi tribe."

- The Samish members "do not and have not lived as a continuous separate, distinct and cohesive Indian cultural or political community."

*Id.* After making these findings about the Samish, the district court stated as a conclusion of law that "[o]nly tribes recognized as Indian political bodies by the United States may possess and exercise the tribal fishing rights secured and protected by the treaties of the United States." *Id.* at 1111.[2] The district court therefore concluded that "at this time" the Samish was not a treaty tribe and "presently" did not hold treaty fishing rights. *Id.*

We affirmed the district court in a divided decision, noting

---

[2]This conclusion is surprising given that in *Washington I* the district court determined that the Stillaguamish Tribe and the Upper Skagit Tribe were treaty tribes, although neither was federally recognized at the time. *See* 384 F. Supp. at 378-79.

that "[w]e have defined a single necessary and sufficient condition for the exercise of treaty rights by a group of Indians descended from a treaty signatory: the group must have maintained an organized tribal structure." *United States v. Washington*, 641 F.2d 1368, 1372 (9th Cir. 1981) ("*Washington III*"). In determining whether this condition exists, we examine the organizational structure of the tribe at the time of the treaty signing with allowances for inevitable adaptation and assimilation: "tribal status is preserved if some defining characteristic of the original tribe persists in an evolving tribal community." *Id.* at 1372-73. Although the district court had erred in concluding that a tribe must be federally recognized in order to exercise treaty fishing rights, we held that the district court's findings of fact were not clearly erroneous and they provided some support for the conclusion that the Samish had not maintained an organized tribal structure.[3] *Id.* at 1373-74.

Because the Samish's inability to exercise their treaty fishing rights hinged on their status as an unrecognized tribe, and because the United States, tribes that opposed the Samish's exercise of treaty fishing rights, and the district court all suggested that future federal recognition might warrant reexamination of the Samish's treaty fishing rights,[4] the Samish

---

[3]In dissent, Judge Canby argued that the district court's factual findings could not be so easily severed from its erroneous belief in the necessity of federal recognition. 641 F.2d at 1374-75 (Canby, J., dissenting). Indeed, many of the findings simply reflected the Samish's lack of federal recognition. *Id.* at 1375. Because the district court's findings were insufficient to answer the proper legal inquiry, whether the Samish had "maintained tribal structures reflecting the degree of organization that existed at the time of the treaties, with reasonable allowances for adaptation to changing conditions," *id.* at 1374, Judge Canby would have remanded the case for further findings of fact. *Id.* at 1375-76.

[4]For example, the government argued that "should [the Samish] succeed in obtaining 'acknowledgment' of their current status as [an] 'Indian tribe[ ]' in the pending administrative proceedings, this might justify an application to re-open the present judgment against them." Brief for

continued their pursuit of federal recognition. The Samish had first sought federal recognition in 1972, three years after a Bureau of Indian Affairs ("BIA") employee removed the Samish from a list used to determine whether a tribe was federally recognized. *See Greene v. Babbitt*, 943 F. Supp. 1278, 1281, 1284 (W.D. Wash. 1996).[5] The Department of the Interior took no action on the Samish's application until 1979, and in 1987 the BIA issued a final decision denying tribal recognition of the Samish. *See* Final Determination That the Samish Indian Tribe Does Not Exist as an Indian Tribe, 52 Fed. Reg. 3709 (Feb. 5, 1987).

The Samish then filed an action challenging the BIA's denial of federal recognition. The Tulalip Tribe sought to intervene in that proceeding, arguing that federal recognition of the Samish would lead to a dilution of the Tulalip's fishing rights. The district court denied the Tulalip's intervention motion and, in an interlocutory appeal, we affirmed the denial. *Greene v. United States*, 996 F.2d 973, 975 (9th Cir. 1993). We held that although the federal recognition and treaty fishing rights inquiries were similar, "each determination serves a different legal purpose and has an independent legal effect." *Id.* at 976. We noted that even if the Samish achieved federal recognition, the tribe would need to challenge the decision in *Washington II* before it could exercise fishing rights. *Id.* at 977.[6]

United States in Opposition to Petition for a Writ of Certiorari, *Duwamish Tribe v. Washington*, 454 U.S. 1143 (1982) (No. 81-509). Likewise, rather than ruling that the Samish no longer held treaty fishing rights, the district court ruled that the Samish "presently" did not hold such rights. *Washington II*, 476 F. Supp. at 1111.

[5]Until the Department of the Interior adopted acknowledgment regulations in 1978, *see* 25 C.F.R. §§ 83.1-83.13 (2003), the federal government decided on an ad hoc basis which groups of Indians would be recognized as tribes. *See* Barbara N. Coen, *Tribal Status Decision Making: A Federal Perspective on Acknowledgment*, 37 New Eng. L. Rev. 491, 491 (2003).

[6]In dissent, Judge Reinhardt argued that if the Samish qualified for federal recognition, they necessarily also qualified for treaty fishing rights.

On the merits of the Samish's challenge to the denial of federal recognition, the district court vacated the BIA's decision and remanded the case for a formal adjudication under the Administrative Procedures Act. *Greene v. Lujan*, No. C89-645Z, 1992 WL 533059, at *9 (W.D. Wash. Feb. 25, 1992), *aff'd*, *Greene v. Babbitt*, 64 F.3d 1266 (9th Cir. 1995). After an eight-day hearing, an Administrative Law Judge ("ALJ") found that the Samish met all of the criteria necessary for federal recognition. The BIA rejected some of the ALJ's findings and conclusions, but ruled in favor of Samish recognition. *See* Final Determination for Federal Acknowledgment of the Samish Tribal Organization as an Indian Tribe, 61 Fed. Reg. 15,825 (Apr. 9, 1996). The district court reinstated the deleted findings and conclusions, however, and affirmed the recognition decision. *Greene v. Babbitt*, 943 F. Supp. at 1288-89. The district court also noted that the Samish's "long journey for recognition has been made more difficult by excessive delays and governmental misconduct." *Id.* at 1281.

On August 23, 2002, the Samish filed with the district court a Rule 60(b)(6) motion to be relieved of the judgment in *Washington II.* The United States and nine tribes whose treaty fishing rights were confirmed in *United States v. Washington* ("the Opposition Tribes") opposed the Samish's motion. The district court held that federal recognition was not an extraordinary circumstance, reasoning that "a tribe's recognition, or nonrecognition, has no impact on whether it may exercise treaty rights." *United States v. Washington*, No. CV 70-09213, Subproceeding No. 01-2, slip op. at 13, 16 (W.D. Wash. Dec. 19, 2002). The district court also noted that the Samish had not alleged that the *Washington II* proceeding was

996 F.2d at 981 (Reinhardt, J., dissenting). Judge Reinhardt also noted that, as a practical matter, federal recognition "will undoubtedly carry great weight in any judicial reconsideration of Samish entitlement to treaty fishing rights." *Id.* at 982.

fundamentally unfair or that the Samish had been prevented from adducing evidence in support of its claim. The interest in finality was an equally compelling factor that weighed against reopening, given "the unmistakable conclusion that, at this stage, their addition would wreak havoc on hard-wrought management agreements and plans." *Id.* at 17.

The Samish filed a motion for reconsideration of the district court's ruling. In the motion, the Samish included a proposal that addressed the possible disruptions that its intervention in *Washington I* might cause. The district court denied the motion, reaffirming its conclusion that federal recognition is not an extraordinary circumstance and that the interest in finality remained an overriding concern. This appeal followed. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## STANDARD OF REVIEW

We review the denial of a Rule 60(b) motion for an abuse of discretion. *G.C. & K.B. Invs., Inc. v. Wilson*, 326 F.3d 1096, 1108 (9th Cir. 2003). Under the abuse of discretion standard, we must affirm the judgment below unless (1) we "have a definite and firm conviction that the district court committed a clear error of judgment in the conclusion it reached upon weighing the relevant factors," (2) the district court applied the wrong law, or (3) the district court rested its decision on clearly erroneous findings of material fact. *SEC v. Coldicutt*, 258 F.3d 939, 941 (9th Cir. 2001).

## ANALYSIS

### I. Did the District Court Abuse Its Discretion By Ruling that Federal Recognition of the Samish Was Not an Extraordinary Circumstance?

The Samish contend that the district court abused its discretion by ruling that federal recognition was not an extraordi-

nary circumstance that warranted reopening the judgment in *Washington II.* The Samish argue that this abuse of discretion resulted from errors of law.

**[1]** Federal Rule of Civil Procedure 60(b) provides that "[o]n motion and upon such terms as are just, the court may relieve a party . . . from a final judgment, order, or proceeding for the following reasons: . . . (6) any other reason justifying relief from the operation of the judgment." The Rule 60(b)(6) catchall provision applies only when the reason for granting relief is not covered by any of the other reasons set forth in Rule 60. *Cmty. Dental Servs. v. Tani*, 282 F.3d 1164, 1168 & n.8 (9th Cir. 2002). It "has been used sparingly as an equitable remedy to prevent manifest injustice" and "is to be utilized only where extraordinary circumstances prevented a party from taking timely action to prevent or correct an erroneous judgment." *United States v. Alpine Land & Reservoir Co.*, 984 F.2d 1047, 1049 (9th Cir. 1993). Thus, a party seeking to reopen a case under Rule 60(b)(6) "must demonstrate both injury and circumstances beyond his control that prevented him from proceeding with the prosecution or defense of the action in a proper fashion." *Cmty. Dental Servs.*, 282 F.3d at 1168.

**[2]** The Samish argue that the district court misinterpreted our precedents in ruling that "a tribe's recognition, or nonrecognition, has no impact on whether it may exercise treaty rights." It is well-settled that federal nonrecognition cannot divest a tribe of treaty rights. In *Washington I*, we held that "[n]onrecognition of the tribe by the federal government and the failure of the Secretary of the Interior to approve a tribe's enrollment may result in loss of statutory benefits, but can have no impact on vested treaty rights." 520 F.2d at 692-93. In *Washington III*, we held that the district court's view that federal recognition is required "is clearly contrary to our prior holding and is foreclosed by well-settled precedent." 641 F.2d at 1371; *see also Greene v. United States*, 996 F.2d at 976 (noting that "[f]ederal recognition is not a threshold condition

a tribe must establish to fish under the Treaty of Point Elliott").

**[3]** Although we have previously held that federal recognition is not *necessary* for the exercise of treaty fishing rights by a signatory tribe, we have never held that federal recognition is not a *sufficient* condition for the exercise of those rights. Indeed, our precedent leads us to the ineviable conclusion that federal recognition is a sufficient condition for the exercise of treaty rights. We have "defined a single necessary and sufficient condition for the exercise of treaty rights by a group of Indians descended from a treaty signatory: the group must have maintained an organized tribal structure." *Washington III*, 641 F.2d at 1372. "For this purpose, tribal status is preserved if some defining characteristic of the original tribe persists in an evolving tribal community." *Id.* at 1372-73.

The mandatory criteria for federal recognition include the following:

> (b)   A predominant portion of the petitioning group comprises a distinct community and has existed as a community from historical times until the present.
>
> . . .
>
> (c)   The petitioner has maintained political influence or authority over its members as an autonomous entity from historical times until the present.

25 C.F.R. § 83.7.[7] The Samish argue persuasively that because they met the mandatory criteria for federal recognition, they necessarily met the condition for the exercise of treaty rights. *See Greene v. United States*, 996 F.2d at 981

---

[7]The regulations define "historical" as "dating from first sustained contact with non-Indians." 25 C.F.R. § 83.1.

(Reinhardt, J., dissenting) (arguing that "[i]f the single *necessary and sufficient* criterion for treaty rights is also a *necessary* condition for federal recognition, then achieving the latter necessarily satisfies the single qualification for the former").

Indeed, we have never held that recognition of a tribe — as opposed to nonrecognition — is irrelevant to its exercise of treaty rights, despite some dicta to the contrary. *See Greene v. Babbitt*, 64 F.3d at 1270 (incorrectly asserting that in *Washington I* "we held that a tribe's recognition or lack of recognition by the Secretary of the Interior does not determine whether the tribe has vested treaty rights"). This is not surprising, given the traditional deference that the federal courts pay to the political branches in determining whether a group of Indians constitutes a tribe. *See United States v. Holliday*, 70 U.S. (3 Wall.) 407, 419 (1865) (holding that "[i]f by [the executive and other political departments of the government] those Indians are recognized as a tribe, this court must do the same"); *Washington I*, 384 F. Supp. at 400 (concluding that "[t]he recognition of a tribe as a treaty party or the political successor in interest to a treaty party is a federal political question on which state authorities and federal courts must follow the determination by the legislative or executive branch of the Federal Government"); William C. Canby, Jr., *American Indian Law in a Nutshell* 6 (4th ed. 2004) ("Once granted, . . . the recognition will bind the courts until it is removed by the Executive or Congress.").[8]

---

[8]Indeed, the United States argued in *Washington III* that "[w]hile recent cases have indicated that the federal government's failure to recognize a tribe is not dispositive, *positive* recognition by the United States is accorded great deference and may well be controlling." Brief for United States in Opposition to Petition for a Writ of Certiorari, *Duwamish Tribe v. Washington*, 454 U.S. 1143 (1982) (No. 81-509) (emphasis added). The United States also noted that "[w]here the Congress or executive branch has expressly recognized a group of Indians as a tribe, the courts have repeatedly deferred to this essentially political decision" and that "*where there has been no such recognition*, a district court may make a factual

It would be a rare case indeed where a court would deny treaty rights to a signatory tribe on the ground that it lacks an organized tribal structure, where the Department of the Interior has recognized that same tribe as a "distinct community [that] has existed as a community from historical times until the present" and that it "has maintained political influence or authority over its members as an autonomous entity from historical times until the present." 25 C.F.R. § 83.7; *see also* Felix S. Cohen, *Handbook of Indian Law* 5 (1982 ed.) ("No congressional or executive determination of tribal status has been overturned by the courts. . . .").

The district court erred in concluding that, because nonrecognition cannot impact vested treaty rights, recognition is irrelevant. The Samish would almost certainly have won the right to exercise its treaty fishing rights had the tribe been federally recognized at the time of *Washington II*. And although we have never explicitly held that federal recognition necessarily entitles a signatory tribe to exercise treaty rights,[9] this is an inevitable conclusion.

Although federal recognition is for all practical purposes determinative of whether the tribe has maintained an organized tribal structure, the Opposition Tribes argue that the Samish's federal recognition is still not an extraordinary circumstance. That is, the relevance of the Samish's federal recognition is not the *fact* of the recognition itself, but rather the

inquiry into 'whether a group of citizens of Indian ancestry is descended from a treaty signatory and has maintained an organized tribal structure.' " Brief for the Federal Appellees, *Washington III*, 641 F.2d 1368 (9th Cir. 1981) (No. 79-4447, 79-4472) (emphasis added).

[9]In extreme circumstances, courts may be able to overturn the decision to recognize a tribe. *See Baker v. Carr*, 369 U.S. 186, 216-17 (1962) (in dicta) ("Able to discern what is 'distinctly Indian,' the courts will strike down any heedless extension of that label. They will not stand impotent before an obvious instance of a manifestly unauthorized exercise of power." (citing *United States v. Sandoval*, 231 U.S. 28, 46 (1913))).

*factual findings* underlying that recognition, and whether the Samish had a full opportunity to present the facts supporting its treaty status to the district court in *Washington II*. That an ALJ arrived at different factual findings on better evidence is not a reason for granting a Rule 60(b)(6) motion. *See Alpine Land & Reservoir Co.*, 984 F.2d at 1049 (holding that Rule 60(b)(6) "is to be utilized only where extraordinary circumstances prevented a party from taking timely action to prevent or correct an erroneous judgment").

**[4]** The crucial issue here is whether the fact that the Samish had the opportunity to litigate the factual basis underlying the tribe's treaty status in *Washington II* means that the Samish were not "prevented . . . from proceeding with the prosecution or defense of the action in a proper fashion." *Cmty. Dental Servs.*, 282 F.3d at 1168. In light of the government's "excessive delays and . . . misconduct" in withholding of recognition from the Samish, a circumstance beyond their control; the government's position in *Washington II* that federal recognition was necessary and that future federal recognition might justify revisiting the treaty rights issue; and the district court's erroneous conclusion that nonrecognition was decisive and wholesale adoption of the United States' boilerplate findings of fact in *Washington II*, we conclude that the Samish were effectively prevented from proving their tribal status "in a proper fashion."

For its part, the government argues that *Washington II* should not be reopened, because the judgment is not inconsistent with the federal recognition of the Samish. That is, the federally recognized Samish may have existed since historical times as a distinct group, enjoy a government-to-government relationship with the United States, and yet still not be the successor to the Samish Tribe that was a signatory to the Treaty of Point Elliott, because the Swinomish Indian Tribal Community and the Lummi Nation are the political successors to the treaty-time Samish.

The government's position is inconsistent with our precedent. In *Washington III*, we "defined a single necessary and sufficient condition for the exercise of treaty rights by a group of Indians descended from a treaty signatory: the group must have maintained an organized tribal structure." 641 F.2d at 1372. Yet the government in essence argues that this "single necessary and sufficient condition" is necessary but not sufficient. It is undisputed that the Samish were a party to the Treaty of Point Elliott. *See,* e.g., *Washington II*, 476 F. Supp. at 1106. It is also clear that the Samish "has been continuously identified throughout history as Indian or aboriginal, has existed as a distinct community since first sustained European contact, has maintained political influence within itself as an autonomous entity and that 80 percent of its members are descendants of the historical Samish tribe." 61 Fed. Reg. 15825, 15826.[10] As the Samish are a signatory tribe and have proved the single necessary and sufficient condition for the exercise of treaty rights, the res judicata effect of *Washington II* is all that is keeping the Samish from pursuing its treaty rights.[11]

Moreover, no tribe can be the political successor to the Samish unless that tribe merged or consolidated with the Samish. *See United States v. Suquamish Indian Tribe*, 901 F.2d 772, 776 (9th Cir. 1990) (holding that "for a signatory

---

[10]One commentator has explained that by acknowledging a tribe, the Department of the Interior "is not 'granting' sovereign status or powers to the group, nor is it creating a tribe made up of its Indian descendants . . . . Rather, the Department is acknowledging that the sovereign has existed continuously since historic times, retaining its inherent powers." Coen, *Tribal Status Decision Making*, 37 New Eng. L. Rev. at 499.

[11]*United States v. Oregon*, 29 F.3d 481 (9th Cir. 1994), is not to the contrary. There, the issue was whether constituent tribes of the federally recognized Colville Confederacy had abandoned treaty rights by breaking away from the Yakima Nation and Nez Perce Tribe, the beneficiaries of treaty fishing rights in the Yakima Treaty and The Nez Perce Treaty. *Id.* at 486-87. In the Treaty of Point Elliott, by contrast, each individual party tribe was guaranteed fishing rights. *See* 12 Stat. at 928.

tribe to obtain treaty tribe status from another signatory tribe, it must first show that the two tribes or cohesive bands thereof consolidated or merged and demonstrate also that together they maintain an organized tribal structure"). The district court in *Greene v. Babbitt* specifically reinstated a finding by the ALJ that the Samish and the Swinomish had not merged, 943 F. Supp. at 1288 & n.13, and the fact that some members of the Swinomish and Lummi tribes have Samish ancestry does not make them political successors to the Samish. *See Oregon*, 29 F.3d at 484. To the extent that the district court in *Washington I* found that the Samish had merged or combined with the Lummi and the Swinomish,[12] this is clearly inconsistent with the federal recognition of the Samish. *See* 25 C.F.R. § 83.7(c) (identifying one of the mandatory criteria for recognition as the petitioner's maintenance of "political influence or authority over its members as an autonomous entity from historical times until the present").

[5] We conclude that the district court misinterpreted our precedents, and thereby abused its discretion, in ruling that the fact of federal recognition had no impact on whether the Samish may exercise treaty fishing rights. Federal recognition is determinative of the issue of tribal organization, the issue upon which the Samish were denied treaty fishing rights in *Washington II*. As the Samish's lack of recognition was a circumstance beyond the tribe's control, their subsequent recognition is an extraordinary circumstance that warrants setting aside the judgment in *Washington II*.

---

[12]The district court found that "[t]he present Lummi Tribe also includes descendants of the Semiahmoo and Samish Indians of 1855." *Washington I*, 384 F. Supp. at 360. Without naming the Samish, the district court found that "[t]he intervenor Swinomish Indian Tribal Community is the present-day tribal entity which, with respect to the matters that are the subject of this litigation, is a political successor in interest to certain tribes and bands and groups of Indians which were parties to the Treaty of Point . . . ." *United States v. Washington*, 459 F. Supp. 1020, 1039 (W.D. Wash. 1978).

## II.   Do    the    District    Court's    Finality    Concerns Independently Support Its Denial of the Samish's Rule 60(b)(6) Motion?

Although we conclude that federal recognition of the Samish constitutes an extraordinary circumstance for purposes of Rule 60(b)(6), we still must decide whether the district court's finality concerns independently justify its denial of the Samish's motion.

The Samish argue that the district court abused its discretion by failing to balance finality concerns against the interest in achieving justice. The district court stated that the motion raised two principal issues: (1) whether extraordinary circumstances justified reopening the judgment, and (2) "whether the interests in finality are paramount to other interests." Having concluded that the lack of extraordinary circumstances was an independent basis for denying relief, the district court did not balance finality concerns but rather stated that they were "[a]n equally compelling factor."

In discussing the interest in finality, the district court stated:

> The United States and the Opposition Tribes point out that, in reliance on *Washington II*, this court has approved many state-tribal fish management plans, mediated and decided intertribal disputes on treaty fishing issues, determined treaty tribes' usual and accustomed fishing places, and decided allocation issues. The United States and Opposition Tribes rightly observe that management of fish harvest involves a delicate balancing of interests within the overall framework and that these management plans — achieved after considerable time and expense — would be upset by the addition of another Tribe at this late stage.
>
> . . . The Samish have not convincingly rebutted, nor could they, the unmistakable conclusion that, at this

stage, their addition would wreak havoc on hard-wrought management agreements and plans.

(Citation omitted.) The district court also noted that the interest in finality is at its zenith in natural resource allocation cases.

In its motion for reconsideration, the Samish included a proposal to minimize possible disruptions that its participation in *Washington I* would entail. The Samish noted that three of the tribes participating in *Washington I* had established themselves as successors in interest to Samish treaty rights, and the Samish "would agree to exercise treaty fishing rights under the orders in the case that apply to these three tribes, and under the regulatory authority and framework of the three tribes." Under this proposal, the Samish argued, their inclusion would not disrupt existing orders.

Despite "the Samish's efforts to craft a workable, minimally disruptive framework for the Tribe's intervention," the district court remained unconvinced: "Under any scenario, the Samish, in addition to the other newly recognized Tribes likely to seek intervention, would necessarily inject themselves into sensitive agreements and upset current treaty tribes' allocations." The district court then hedged its conclusion somewhat by pointing out that finality concerns "were not the sole or even the chief basis for denying the tribe's motion to reopen," and that "[t]o focus on mitigating the effects of reopening a judgment, rather than on whether reopening a judgment is procedurally allowable, is to put the cart before the horse." It also noted that "even putting aside the finality concerns . . . , there are ample reasons to deny the Tribe another chance at litigating its treaty status."

[6] Because it is unclear to what extent the district court relied on finality concerns in denying the Samish's motions, especially after the Samish submitted a proposal for minimizing the disruptive effects of its participation in *Washington I*,

we conclude that finality concerns do not independently support the district court's denial of the Samish's Rule 60(b)(6) motion. That is, had the district court properly concluded that federal recognition was an extraordinary circumstance the somewhat speculative concerns about finality are insufficient to have carried the day.

The Opposition Tribes' point is well taken that "[h]aving supervised the litigation since 1970, the district court is in the best position to judge the impact adding new parties might have."[13] Nevertheless, the fact that the district court has ongoing judicial supervision of *Washington I* undercuts these finality concerns. Unlike a judgment between private parties, the allocation of natural resources between treaty tribes and others cannot help but be an ongoing venture. Indeed, the 17,500 docket entries and more than 50 separately-numbered subproceedings in *Washington I* are testament to the inherent *lack* of finality of the judgment. Finally, the fact that the government and the Opposition Tribes in *Washington II* argued that Samish recognition could well justify reopening further weakens finality concerns.

## CONCLUSION

[7] For the foregoing reasons we reverse the order of the district court denying the Samish's Rule 60(b)(6) motion and remand for further proceedings consistent with this opinion.

**REVERSED and REMANDED.**

---

[13]We note, however, that a number of different district judges have presided over various parts of this case in the 34 years that it has been pending in the Western District of Washington.

BEA, Circuit Judge, dissenting:

Appellant Samish Indian Tribe ("Samish Tribe") appeals the district court's order denying the Samish Tribe's motion pursuant to Federal Rule of Civil Procedure 60(b)(6) for relief from the district court's prior judgment in *United States* v. *Washington*, 476 F. Supp. 1101 (W.D. Wash. 1979), *aff'd*, 641 F.2d 1368 (9th Cir. 1981) ("*Washington II*"). The majority opinion holds that the district court abused its discretion in denying the Samish Tribe's Rule 60(b)(6) motion because "[f]ederal recognition [of the Samish Tribe] is determinative of the issue of tribal organization, the issue upon which the Samish were denied treaty fishing rights in *Washington II*," and "[a]s the Samish's lack of recognition was a circumstance beyond the tribe's control, their subsequent recognition is an extraordinary circumstance that warrants setting aside the judgment in *Washington II*." Slip op. at 124.

With respect, I believe the majority opinion errs in two regards. *First*, federal recognition as a tribe has never been required to establish off-reservation fishing rights pursuant to the Treaty of Point Elliott (1855), and the Samish Tribe was not precluded in *Washington II* from presenting evidence of having maintained an organized tribal structure, which evidence could have supported a finding that it was entitled to such treaty fishing rights. *Second*, neither the federal recognition of the Samish Tribe by the Bureau of Indian Affairs ("BIA") nor the BIA's underlying factual findings constitute evidence that the Samish Tribe maintained an organized tribal structure to which a district court determining treaty status must accord any deference. Because I believe the majority opinion departs from our jurisprudence in holding otherwise,[1] I respectfully dissent.

---

[1]Except " 'when an intervening Supreme Court decision undermines an existing precedent of the Ninth Circuit, and both cases are closely on point,' " "[a] three-judge panel generally has no power to overrule a decision of this court." *Rotec Industries, Inc.* v. *Mitsubishi Corp.*, 348 F.3d 1116, 1122 n.3 (9th Cir. 2003). Rather, "[s]uch a ruling may be handed down [only] by an en banc panel of this court or the United States Supreme Court (and state high courts on issues of state law)." *Id.*

## I.

## A.

The issue before this court is not whether the Samish Tribe might qualify for off-reservation fishing rights pursuant to the Treaty of Point Elliott were it to commence an action today. Rather, as the majority opinion states: "The crucial issue here is whether the fact that the Samish had the opportunity to litigate this issue in *Washington II* means that the Samish were not 'prevented . . . from proceeding with the prosecution or defense of the action in a proper fashion.' " Slip op. at 122 (internal citation omitted). The majority opinion answers in the negative; I believe our precedent requires an affirmative answer.

Our precedent in this area of the law and with regard to the very parties at issue here makes clear, if nothing else, that whether a group of Native Americans are recognized as a tribe by the federal government is a distinct legal inquiry from whether that same group of Native Americans qualify for off-reservation fishing rights pursuant to the Point Elliott and related treaties. Further, recognition as a tribe is *not* a necessary precondition to qualify for such treaty fishing rights.[2]

Thus, in *United States* v. *Washington*, 520 F.2d 676, 692-93 (9th Cir. 1975) ("*Washington I*") (emphasis added), we held: "Nonrecognition of the tribe by the federal government and the failure of the Secretary of the Interior to approve a tribe's enrollment may result in loss of statutory benefits, *but can have no impact on vested treaty rights*." Likewise, when the district court in *Washington II* held that "[o]nly tribes rec-

---

[2]This precedent in no way renders federal recognition a nullity. Rather, "[f]ederal recognition brings its own obvious rewards, not the least of which is the eligibility of federal money for tribal programs, social services and economic development." *Green* v. *United States*, 996 F.2d 973, 978 (9th Cir. 1993) ("*Green I*").

ognized as Indian political bodies by the United States may possess and exercise the tribal fishing rights secured and protected by the treaties of the United States," 476 F. Supp. at 1111, we held on appeal:

> This conclusion is clearly contrary to our prior holding and is foreclosed by well-established precedent. . . .
>
> * * *
>
> We have defined a single necessary and sufficient condition for the exercise of treaty rights by a group of Indians descended from a treaty signatory: the group must have maintained an organized tribal structure.

*Washington II*, 641 F.2d at 1371, 1372; *accord id.* at 1374 (Canby, J., dissenting) ("The majority opinion quite correctly rejects the conclusion of law that federal recognition is essential to the exercise of treaty rights."). In *United States* v. *Suquamish Indian Tribe*, 901 F.2d 772, 776 n.10 (9th Cir. 1990) (emphasis added), we noted that "*[f]ederal recognition by the Department of Interior is not required for a tribe to obtain treaty tribe status*." Again, in *Green I*, "[w]e recognize[d] that the two inquiries are similar," but reiterated that "each determination serves a different legal purpose and has an independent legal effect" and that "*[f]ederal recognition is not a threshold condition a tribe must establish to fish under the Treaty of Point Elliott*." 996 F.2d at 976 (emphasis added); *accord id.* at 981 (Reinhardt, J., dissenting) (arguing that "federal recognition *necessarily* qualifies for treaty rights a tribe that claims them," but acknowledging that "federal recognition is not a precondition to receiving treaty rights") (emphasis in original). Finally, in *Green* v. *Babbitt*, 64 F.3d 1266, 1270 (9th Cir. 1995) ("*Green II*"), we reviewed our precedent and held once more: "[T]he recognition of the tribe for purposes of statutory benefits is a question wholly indepen-

dent of treaty fishing rights. . . . Our decision in [*Green I*] can leave no serious doubt that our court regards the issues of tribal treaty status and federal acknowledgment as fundamentally different."[3]

Our precedent is equally clear that although recognition as a tribe may be a decision generally left to the discretion of the Executive Branch, "[w]hether a group of citizens of Indian ancestry is descended from a treaty signatory and has maintained an organized tribal structure [so as to qualify for off-reservation fishing rights pursuant to the Point Elliott and related treaties] is a factual question which a district court is competent to determine." *Washington I*, 520 F.2d at 693; *accord Washington II*, 641 F.2d at 1371.

Thus, the fact alone that the Samish Tribe was not recognized by the federal government at the time of *Washington II* in no way prevented it from proffering the type of evidence that could have resulted in a finding by the district court in *Washington II* that the Samish Tribe had maintained an organized tribal structure and, therefore, was entitled to off-reservation fishing rights pursuant to the Treaty of Point Elliott. Indeed, two other tribes did precisely this. Specifically, in *Washington I*, the district court held that the Stillaguamish Tribe and Upper Skagit Tribe were both entitled to off-reservation fishing rights pursuant to the Treaty of Point Elliott *despite the fact that they were not at the time recognized as tribes by the federal government. United States* v. *Washington*, 384 F. Supp. 312, 378-79, 406 (W.D. Wash. 1974), *aff'd*, 520 F.2d 676 (9th Cir. 1975) ("*Washington I*"). We affirmed:

> The Stillaguamish and Upper Skagit Tribes . . . are not recognized as organized tribes by the federal

---

[3]In light of this precedent, the majority opinion's statement that "the Samish's inability to exercise their treaty fishing rights hinged on their status as an unrecognized tribe," Slip op. at 114, is inexplicable.

government. . . . Evidence supported the court's findings that the members of the two tribes are descendants of treaty signatories and have maintained tribal organizations. We therefore affirm the district court's conclusion that the Stillaguamish and Upper Skagit Tribes are entities possessing rights under the Treaty of Point Elliott.

*Washington I*, 520 F.2d at 692-93. Nor, finally, has the Samish Tribe alleged, much less proved, that the evidence demonstrating that it was entitled to off-reservation fishing rights pursuant to the Treaty of Point Elliott was unavailable at the time of the trial held in *Washington II* to adjudicate this issue.

Because the Samish Tribe has presented no evidence that it was precluded from doing precisely what the Stillaguamish and Upper Skagit Tribes did, it has not shown that it was " 'prevented . . . from proceeding with the prosecution or defense of the action in a proper fashion,' " Slip op. at 122, such that its recognition as a tribe now should permit it to set aside the judgment in *Washington II*.[4]

### B.

Despite this clear, consistent and controlling authority, the majority opinion "conclude[s] that the Samish were effectively prevented from proving their tribal status 'in a proper fashion' " for three reasons:

---

[4]Nor, as the majority opinion recognizes, is the fact "[t]hat an ALJ arrived at a different factual finding [as to federal recognition] on better evidence . . . a reason for granting a Rule 60(b)(6) motion. *See Alpine Land & Reservoir Co.*, 984 F.2d at 1049 (holding that Rule 60(b)(6) 'is to be utilized only where extraordinary circumstances prevented a party from taking timely action to prevent or correct an erroneous judgment')." Slip op. at 122.

[1] the government's 'excessive delays and . . . misconduct' in withholding of recognition from the Samish, a circumstance beyond their control; [2] the government's position in *Washington II* that federal recognition was necessary and that future federal recognition might justify revisiting the treaty rights issue; and [3] the district court's erroneous conclusion that nonrecognition was decisive and wholesale adoption of the United States' boilerplate findings of fact in *Washington II*. . . .

Slip op. at 122. But none of these factors supports granting the Samish Tribe's Rule 60(b)(6) motion.

*First*, although the Samish Tribe initially applied for federal recognition in 1972 and were not finally recognized until 1996, whether the Samish Tribe was entitled to off-reservation fishing rights pursuant to the Treaty of Point Elliott was an issue tried and submitted before the district court in *Washington II* in 1977. *Green* v. *Babbitt*, 943 F. Supp. 1278, 1281 (W.D. Wash. 1996) ("*Green III*") (date of initial application for federal recognition); 61 Fed. Reg. 15825 (date of federal recognition); *Washington II*, 641 F.2d at 1371 n.4 (date of submission before district court). Thus, the majority if not all of the " 'excessive delays and . . . misconduct,' " Slip op. at 122, on which the majority opinion relies occurred after the issue was tried and submitted in *Washington II*.

Further, as noted above, there is no showing that the five-year delay immediately following the Samish Tribe's application for federal recognition to the BIA precluded the Samish Tribe from submitting to the district court in *Washington II* the same evidence of having maintained an organized tribal structure that it had submitted or thereafter would submit to the BIA. Nor is there evidence that the Samish Tribe applied for a postponement of their treaty-rights trial and submission to allow the BIA to determine its recognition claim.

*Second*, "the government's position in *Washington II* that federal recognition was necessary and that future federal recognition might justify revisiting the treaty rights issue," Slip op. at 122, is irrelevant to whether a case is made out for Rule 60(b)(6) relief. The government's position in no way hindered, much less precluded, the Samish Tribe from offering evidence in the *Washington II* district court trial of having maintained an organized tribal structure that could have resulted in a finding by that district court that the Samish were entitled to off-reservation fishing rights pursuant to the Treaty of Point Elliott, as did the unrecognized Stillaguamish and Upper Skagit Tribes. Nor can the Samish Tribe claim the government is estopped to require evidence of having maintained an organized tribal structure by its statement that the issue of treaty rights might be subject to review were the Samish Tribe federally recognized. Any reliance on these statements was unreasonable in view of our holdings. As noted above, even prior to *Washington II*, we had held in *Washington I* that federal recognition as a tribe is *not* a necessary precondition for off-reservation fishing rights pursuant to the Treaty of Point Elliott and that district courts are competent to make the necessary determinations:

> The Stillaguamish and Upper Skagit Tribes . . . are not recognized as organized tribes by the federal government. . . . Nonrecognition of the tribe by the federal government and the failure of the Secretary of the Interior to approve a tribe's enrollment may result in loss of statutory benefits, but can have no impact on vested treaty rights. Whether a group of citizens of Indian ancestry is descended from a treaty signatory and has maintained an organized tribal structure is a factual question which a district court is competent to determine. . . . Evidence supported the court's findings that the members of the two tribes are descendants of treaty signatories and have maintained tribal organizations. We therefore affirm the district court's conclusion that the Stillaguamish

and Upper Skagit Tribes are entities possessing rights under the Treaty of Point Elliott.

*Washington I*, 520 F.2d at 692-93 (internal citations omitted). Accordingly, in *Washington II*, we characterized arguments otherwise as "*clearly* contrary to" and "foreclosed by *well-settled* precedent." 641 F.2d at 1371 (emphasis added).

*Third*, nor is "the district court's erroneous conclusion that nonrecognition was decisive and wholesale adoption of the United States' boilerplate findings of fact in *Washington II*," Slip op. at 122, relevant. On appeal, as noted above, we expressly corrected the district court's erroneous conclusion. *Washington II*, 641 F.2d at 1371 ("[The district court's] conclusion is clearly contrary to our prior holding and is foreclosed by well-settled precedent."). Noting that "[t]he district court's statement that federal nonrecognition is decisive, together with its listing of other purported considerations, makes it difficult for us to determine the precise basis for the court's holding that the tribes may not exercise treaty rights," we then "examine[d] the record" ourselves "to determine whether the district court reached the correct result." *Id*. at 1372.

> [T]he district court specifically found that the appellants had not functioned since treaty times as 'continuous separate, distinct and cohesive Indian cultural or political communit(ies).'
>
> *After close scrutiny, we conclude that the evidence supports this finding of fact*. Although the appellants now have constitutions and formal governments, the governments have not controlled the lives of the members. Nor have the appellants clearly established the continuous informal cultural influence they concede is required.
>
> The appellants' members are descended from treaty tribes, but they have intermarried with non-Indians

and many are of mixed blood. That may be true of
some members of tribes whose treaty status has been
established. But unlike those persons, those who
comprise the groups of appellants have not settled in
distinctively Indian residential areas.

We cannot say, then, that the finding of insufficient
political and cultural cohesion is clearly erroneous.

*Washington II*, 641 F.2d at 1373-74 (emphasis added; internal
citations omitted).

Indeed, the argument that the district court's erroneous con-
clusion of law in *Washington II* so "permeated the entire fac-
tual history," *id.* at 1375 (Canby, J., dissenting), that the
findings of fact could not be relied upon even by this court
when it applied the correct standard is one that was heralded
by the dissent in *Washington II* and, as demonstrated above,
rejected by the majority:

My difference with the majority is that I am unable
to say that the findings of the district court resolve
the determinative question of tribal continuity or
provide us with the means to do so upon review.

\* \* \*

[T]he conclusions of law help to illustrate the defi-
ciencies of the findings of fact upon which the deci-
sion of the district court is based. The findings that
appellants had not maintained a 'continuous sepa-
rate, distinct and cohesive Indian cultural or political
communit(ies)' or 'organized tribal structure(s) in a
political sense' amounted in context to findings that
appellants lacked federal recognition or attributes
necessarily dependent upon federal recognition.
These findings consequently do not resolve the cru-
cial factual issue and cannot support the judgment.

Application of the proper legal standards to this case requires new determination of fact, and possibly additional evidence relating to the political organization of the relevant tribes at treaty times. I would therefore remand the matter to the district court for determinations whether appellants have maintained tribal structures reflecting the degree of organization that existed at the time of the treaties, with reasonable allowances for adaptation to changing conditions, and whether some defining characteristic of the original tribes persists in appellants as evolving tribal communities.

*Id*. at 1374, 1375-76 (Canby, J., dissenting). The majority opinion recognizes that this is an argument already made and rejected, Slip op. at 114 n.3, but pays no heed to the crucial finding of not having maintained an organized tribal structure, approved by our decision. Such insouciance to our precedent is inadvisable.

## II.

Although acknowledging that "we have never explicitly held that federal recognition necessarily entitles a signatory tribe to exercise treaty rights," the majority opinion asserts that "this is an inevitable conclusion." Slip op. at 121. Again, this is contrary to our precedent.

In *Green I*, what was thereafter recognized as the Samish Tribe appealed to the district court from the BIA's denial of the Samish Tribe's petitions for recognition. 996 F.2d at 975. The Tulalip Tribe moved to intervene, asserting "two related interests": (1) "that their treaty fishing allocations are threatened by dilution" because the "renewed administrative inquiry into the Samish tribal status will raise nearly identical questions" as those relevant to the Samish Tribe's treaty status; and (2) that "parallel determinations by the BIA will

undermine the precedential effect" of *Washington I* and *Washington II*. *Id*. at 976-77.

The district court denied the motion, holding "that the action did not implicate treaty claims," and we affirmed. *Id*. at 975. As to the first asserted interest, we held that federal recognition "serves a different legal purpose and has an independent legal effect" than does a determination whether the Samish Tribe has treaty rights: "Even if they obtain federal tribal status, the Samish would still have to confront the decisions in *Washington I and II* before they could claim fishing rights." *Id*. at 976-77. As to the second asserted interest, we noted that "the district court ruled expressly that the ALJ 'will not consider' treaty rights" and "that the Samish may not use the reopened hearing [on federal recognition] to attack the [*Washington II*] decision." *Id*. at 977. Further, it held that "[a]ny attempt to relitigate treaty fishing rights would occur in the separate, ongoing *Washington I* forum, where the Tulalip are already parties." *Id*. We continued: *Washington I* "is the forum that will resolve ultimately any attempt to reallocate treaty fishing rights and that is the forum where the Tulalip *and all other interested parties* can have their say." *Id*. at 977-78 (emphasis in original).

Our holding in *Green I* that the proper fora — if any — to relitigate the Samish Tribe's treaty rights were *Washington I and II* and our promise to the Tulalip Tribe that it would have an opportunity to protect its interests in those fora compels the conclusion that federal recognition does *not* necessarily entail treaty status. Indeed, this is clearly what we meant when we said: "Allowing the Tulalip to intervene would only further confuse the issues and postpone what may be inevitable: a direct challenge to the allocation of treaty fishing rights, *which would be fully and independently litigated in the Washington I forum*." *Id*. at 978 (emphasis added). It would have been an empty promise — indeed, a complete deprivation of due process — to deny the Tulalip Tribe's motion to intervene in the Samish BIA recognition proceedings on the basis that

it could later protect its treaty rights in the *Washington I and II* courts, while all along assuming that by virtue of the Samish Tribe gaining federal recognition, the *Washington I and II* courts would be required to grant the Samish Tribe treaty rights. If that was the case, where then was the Tulalip Tribe to protect its interests? Elementary principles of due process, such as the right to present evidence and to be heard before property rights are taken, require that a tribe challenging the Samish Tribe's claims to treaty rights have an opportunity to disprove the maintenance of organized tribal structure and not be precluded from offering such proof by an administrative agency determination from which the challenging tribe was excluded.

Indeed, the majority opinion's "inevitable conclusion," Slip op. at 121, is precisely the argument advanced by the dissent in *Green I*, and rejected by the majority opinion there. Dissenting, Judge Reinhardt argued that "federal recognition is tantamount to acknowledgment by the federal government of tribal entitlement to treaty rights," *id*. at 980-81, and therefore concluded:

> As a practical matter, if the BIA reconsiders its earlier decision, granting federal recognition to the Samish, the agency's determination that the Samish have "maintained tribal political influence or other authority," 25 C.F.R. § 83.7(c), will undoubtedly carry great weight in any judicial reconsideration of Samish entitlement to treaty fishing rights.

*Id*. at 982. To this, the majority opinion replied:

> The dissent speculates that if the BIA reverses its decision and recognizes the Samish as an official tribe, this "will undoubtedly carry great weight in any judicial reconsideration of Samish entitlement to treaty fishing rights." In fact, such a decision would have marginal influence at best. *The* Washington I

> *court need not accord any deference to an agency proceeding that has been expressly limited to matter other than rights under the 1855 treaty.*

*Id.* at 978 (emphasis added).

Our holding in *Green I* that the district court "need not accord any deference" to the BIA's recognition of the Samish Tribe, *id.* at 978, was affirmed in *Green II*. There, the Secretary of the Interior appealed the district court's decision that it was formally to adjudicate under the Administrative Procedure Act whether the Samish should be recognized as a tribe. *Green II*, 64 F.3d at 1268. The Tulalip Tribe appeared as *amicus curiae*, and argued that the Samish were collaterally estopped from litigating tribal recognition by virtue of *Washington II*. *Id.* at 1269. We disagreed, holding that "the recognition of the tribe for purposes of statutory benefits is a question wholly independent of treaty fishing rights." *Id.* at 1270. Dissenting, Judge Wright argued from the same premise as does the majority opinion here:

> *Washington II* precludes a finding that the Samish Tribe has 'maintained tribal political influence or other authority over its members as an autonomous entity throughout history until the present.' 25 C.F.R. § 83.7(c). *Washington II* involved the same factual inquiry into the historicity of the present Samish Tribe. Such an inquiry is a necessary condition both for treaty recognition and for statutory recognition under the current BIA regulations. We have here substantial overlap in evidence and argument, save for subsequently developed evidence; and the claims, although not identical, are closely related. *See* Restatement (Second) of Judgments, § 27 (1982).

\* \* \*

> The factual finding regarding the Samish Tribe's his-
> toricity in *Washington II* precludes what would be a
> near identical inquiry in this case.

*Id*. at 1276. The majority opinion in *Green II* rejected this
argument, noting that in *Green I* "[w]e . . . squarely rejected
the Tulalip's position that federal recognition of the Samish
would be inconsistent with *Washington I* and *II*" and "agreed
with the district court . . . that the question of federal recogni-
tion as a tribe 'did not implicate treaty claims.' " *Id*. at 1271.

Indeed, basic rules of judicial review, collateral estoppel
and evidence dictate this result. The factual findings underly-
ing the BIA's recognition of the Samish Tribe are adjudica-
tive in nature and, thus, not entitled to *Chevron* deference. *See
Chevron U.S.A., Inc.* v. *Natural Resources Defense Council,
Inc.*, 467 U.S. 837 (1984). Further, any proceeding in district
court resulting from the Samish Tribe's successful Rule
60(b)(6) motion will not be the equivalent of an appeal of the
BIA's underlying factual findings, and, thus, the district court
does not owe those factual findings the sort of deference
reviewing courts typically owe. Further, even independent of
*Green II*, the Tulalip Tribe and others not a party to the BIA
proceedings and who did not control those parties to the pro-
ceedings, did not agree to be bound by the proceedings and
were not represented in the proceedings, cannot be collater-
ally estopped from relitigating the BIA's underlying factual
findings. *See* Restatement (Second) of Judgments §§ 27, 39-
42 (1982). Finally, any testimony introduced during the BIA
proceedings is hearsay as to treaty-rights litigation and should
be barred upon objection by the Tulalip Tribe or others that
did not themselves nor did their predecessors in interest have
"an opportunity and similar motive to develop the testimony
by direct, cross, or redirect examination" during the BIA pro-
ceedings. Fed. R. Evid. 804.

Our precedent holds — and, for the reasons explained
above, rightly so — that "[f]ederal recognition does not self-

execute treaty rights claims," *Green I*, 996 F.2d at 977, and "[e]ven if the federal government says that the Samish are an official Indian tribe, whether they may fish as a treaty tribe in common with [other tribes] is another question." *Id.* at 975. The majority opinion's "inevitable conclusion" to the contrary, Slip op. at 121, overrules this prior circuit precedent.

### III.

Until now, our precedent has been both clear and consistent that whether a group of Native Americans are recognized as a tribe by the federal government is a distinct legal inquiry from whether that same group of Native Americans qualify for off-reservation fishing rights pursuant to the Point Elliott and related treaties; and, equally so, that recognition as a tribe is *not* a necessary precondition for off-reservation fishing rights. Thus, the fact that the Samish Tribe was not recognized by the federal government at the time of *Washington II* in no way prevented it (as did the Stillaguamish and Upper Skagit Tribes) from putting forth the type of evidence of having maintained an organized tribal structure that could have resulted in a finding by the district court in *Washington II* that the Samish Tribe was entitled to off-reservation fishing rights pursuant to the Treaty of Point Elliott. Nor has the Samish Tribe adduced any evidence that it was precluded from so doing.

Further, as we have previously held, federal recognition does not compel status under the Point Elliott and related treaties, and, indeed, a district court "need not accord any deference to an agency proceeding that has been expressly limited to matter other than rights under the 1855 treaty." *Green I*, 996 F.2d at 978.

Accordingly, I would affirm the order of the district court.