996 F.2d 973
 26 Fed.R.Serv.3d 222
 Margaret GREENE, in her capacity as Chairman of the Samish
Indian Tribe of Washington; Samish Indian Tribe
of Washington, Plaintiffs-Appellees,
v.
UNITED STATES of America; Bruce Babbitt,*
in his capacity as Secretary of the Interior, Defendants,
Tulalip Tribes of Washington, Defendant-Intervenor-Appellant.
 No. 91-35569.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 1, 1993.
Decided June 22, 1993.
 
 James H. Jones, Jr., Bell & Ingram, Everett, WA, for intervenor-appellant.
 Russel L. Barsh, Anacortes, WA, for plaintiffs-appellees.
 Appeal from the United States District Court for the Western District of Washington.
 Before: WRIGHT, CANBY and REINHARDT, Circuit Judges.
 EUGENE A. WRIGHT, Circuit Judge:
 
 
 1
 The Tulalip Tribes seek to intervene in an action between the Samish Tribe and the Department of Interior regarding federal recognition of the Samish. The Tulalip argue that federal acknowledgment of the Samish as an Indian tribe will lead to the dilution of treaty fishing rights. The district court denied intervention, finding that the action did not implicate treaty claims. We agree that the Tulalip have not identified a protectable interest to warrant intervention. Even if the federal government says that the Samish are an official Indian tribe, whether they may fish as a treaty tribe in common with the Tulalip is another question. We affirm.
 
 I.
 
 2
 The Samish tribe is located in Whatcom County, Washington. Their effort to obtain federal recognition is but part of a continuing battle to regain land and other benefits of tribal heritage, including valuable fishing rights. In 1855, several Indian tribes negotiated the Treaty of Point Elliott with federal representatives in Washington Territory, relinquishing much of their land and reserving the right to fish at all usual and accustomed grounds in common with citizens of the Territory. As the fish became scarce, disputes arose over the allocation of the harvest. District Judge Boldt held that treaty tribes, including the Tulalip, were entitled to take up to 50% of the harvestable fish on runs passing through traditional fishing grounds. United States v. Washington, 384 F.Supp. 312 (W.D.Wash.1974), aff'd, 520 F.2d 676 (9th Cir.1975), cert. denied, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976) ("Washington I"). Washington State regulates the fisheries under the continuing jurisdiction of the Washington I district court.
 
 
 3
 After Judge Boldt's initial decision, the Samish and other Indian groups intervened to assert their own treaty fishing rights. The district court found that they had failed to maintain an organized tribal structure since signing the Treaty of Point Elliott. It rejected their claims as successors to treaty tribes in United States v. Washington, 476 F.Supp. 1101 (W.D.Wash.1979), aff'd, 641 F.2d 1368 (9th Cir.1981), cert. denied, 454 U.S. 1143, 102 S.Ct. 1001, 71 L.Ed.2d 294 (1982) ("Washington II"), effectively leaving the Samish without treaty fishing rights.
 
 
 4
 About that time, the Samish asked that the federal government recognize them as an Indian tribe and they applied for official tribal status under 25 C.F.R. p 83 to obtain governmental protection, services and benefits. The Bureau of Indian Affairs denied their repeated petitions. The agency did not rely upon the factual determinations in Washington II but instead conducted an independent inquiry. The Tulalip and other tribes participated as "interested parties" in the BIA proceeding.
 
 
 5
 The Samish appealed to the district court, alleging due process violations in the agency proceeding. The tribe also asked for judicial recognition of their treaty successor status. On partial summary judgment, the district court ruled that the Samish were barred from relitigating the question of treaty fishing rights because of the res judicata and collateral estoppel effects of Washington II. The remaining issues in the second phase of the action concerned alleged defects in the BIA's administrative process.
 
 
 6
 The Tulalip renewed a motion to intervene, arguing that their treaty fishing rights were threatened by the Samish attempt to obtain federal recognition. The district court denied intervention. The Tulalip appeal.
 
 
 7
 As this appeal was pending, other important developments followed. Judge Zilly held that the Samish had been denied due process in the BIA's evaluation of their acknowledgment petition. The court vacated the agency's earlier decision and remanded for a formal adjudication under the Administrative Procedure Act. Also, new evidence suggested that Judge Boldt allegedly had suffered from a disabling illness when the Washington II judgment was entered. The Samish moved to set aside that judgment. The district court denied that motion, stating that it should be directed to the ongoing Washington I court. The district court also addressed again the status of the Tulalip, reaffirming that the Tribe was not a party but granting it leave to participate as amicus curiae in the remanded proceedings before the BIA.
 
 II.
 A. INTERVENTION AS OF RIGHT
 
 8
 We review de novo a district court's denial of a motion to intervene as of right. United States v. Oregon, 913 F.2d 576, 587 (9th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 2889, 115 L.Ed.2d 1054 (1991).
 
 
 9
 Fed.R.Civ.P. 24(a)[1] establishes four requirements for intervention as of right: timeliness, an interest relating to the subject of the action, practical impairment of the party's ability to protect that interest and inadequate representation by the parties to the action. The rule is construed broadly in favor of applicants for intervention. Id.
 
 
 10
 The district court held that the Tulalip failed to satisfy the second prong of the test, the "interest" requirement. Whether an applicant for intervention demonstrates sufficient interest in an action is a practical, threshold inquiry. No specific legal or equitable interest need be established. Portland Audubon Soc. v. Hodel, 866 F.2d 302, 308 (9th Cir.), cert. denied, 492 U.S. 911, 109 S.Ct. 3229, 106 L.Ed.2d 577 (1989). Nevertheless, the movant must demonstrate a "significantly protectable interest." An economic stake in the outcome of the litigation, even if significant, is not enough. Id. at 309.
 
 1. Dilution of Treaty Fishing Allocations
 
 11
 The Tulalip identify two related interests. First, they argue that their treaty fishing allocations are threatened by dilution. They concede that the district court limited the Samish claims to federal recognition. Thus, adjudication of the Samish treaty fishing rights is not an issue in the pending proceeding. Nevertheless, the Tulalip argue that renewed administrative inquiry into the Samish tribal status will raise nearly identical questions. They assert that the BIA will review much of the same factual record that served as the basis for the judicial allocation of fishing rights.
 
 
 12
 To gain federal acknowledgment, the Samish must establish the requisite social cohesion and community, continuity of political authority and ancestry from a historic tribe. See 25 C.F.R. §§ 83.1 thru 83.7. To assert treaty fishing rights, the Samish must demonstrate that they descended from a treaty signatory and "have maintained an organized tribal structure." Washington II, 641 F.2d at 1372.
 
 
 13
 We recognize that the two inquiries are similar. Yet each determination serves a different legal purpose and has an independent legal effect. Federal recognition is not a threshold condition a tribe must establish to fish under the Treaty of Point Elliott. "Nonrecognition of the tribe by the federal government ... may result in loss of statutory benefits, but can have no impact on vested treaty rights." Id. at 1371 (quoting Washington I, 520 F.2d at 692-93); see also United States v. Suquamish Indian Tribe, 901 F.2d 772, 776 n. 10 (9th Cir.1990). Only Congress can abrogate an Indian treaty. Washington II, 641 F.2d at 1371. Other Washington tribes, including the Stillaguamish and the Upper Skagit, have treaty fishing rights even though not federally recognized. See Washington I, 520 F.2d at 692-93.
 
 
 14
 Similarly, the Samish need not assert treaty fishing rights to gain federal recognition. They might document repeated identification by federal and state authorities, see 25 C.F.R. § 83.7(a), sometime after or independent of the 1855 Treaty. Even if they obtain federal tribal status, the Samish would still have to confront the decisions in Washington I and II before they could claim fishing rights. Federal recognition does not self-execute treaty rights claims.[2]
 
 2. Preservation of Prior Decisions
 
 15
 Apart from protecting fishing rights, the Tulalip argue that they have an interest in preserving the prior decisions in Washington I and II. They contend that parallel determinations by the BIA will undermine the precedential effect of those decisions. Intervention may be required when considerations of stare decisis indicate that an applicant's interest will be practically impaired. United States v. Oregon, 839 F.2d 635, 638 (9th Cir.1988).
 
 
 16
 Where the precedential impact has been clear, we have allowed intervention. In Oregon, we held that residents of a state mental health facility could intervene in an action against the facility by the federal government. Because the litigation involved the conditions of the institution, "[f]actual and legal determinations concerning the nature of those conditions" would affect directly any subsequent relief sought by the residents. Id.
 
 
 17
 The Tulalip fail to explain how the stare decisis effect of Washington I and II would be directly undercut. Any attempt to relitigate treaty fishing rights would occur in the separate, ongoing Washington I forum, where the Tulalip are already parties. They argue that factual determinations in the new administrative hearing could be used to overturn the judicial decisions. Yet in detailing the conditions on remand to the BIA, the district court ruled expressly that the ALJ "will not consider" treaty rights established by the Boldt decision. The Tulalip's arguments about stare decisis effects are therefore unpersuasive.
 
 
 18
 In a related argument, the Tulalip assert an interest in defending Washington II from collateral attack by way of the administrative hearing. This interest is immaterial because the district court explicitly ruled that the Samish may not use the reopened hearing to attack the Boldt decision.
 
 
 19
 The Tribe is no doubt correct that should the Samish prevail before the BIA and gain recognition, the next step would be to assert fishing rights as well. This claim would, however, require a direct challenge to Washington II. The action before the district court no longer involves treaty fishing rights. As we just said, the Samish may not gain fishing rights from federal recognition alone. Presently, the Tulalip's interest in preserving the favorable effects of stare decisis is too speculative to warrant intervention.
 
 
 20
 We agree with the dissent that, above all, practicality must govern our analysis of the Tulalip's attempt to intervene. But it is the dissent that calls for an impractical result by ignoring the fact that the Washington I case is ongoing. Washington state regulates its fisheries under the continuing jurisdiction of the Washington I district court. Many tribes participate in this comprehensive judicial and administrative scheme. That is the forum that will resolve ultimately any attempt to reallocate treaty fishing rights and that is the forum where the Tulalip and all other interested parties can have their say.[3] Keeping this federal recognition action separate and independent so that it does not become entangled with the complex, interminable litigation involving treaty fishing rights best serves the twin goals identified by the dissent, efficiency and access to the courts. Allowing the Tulalip to intervene would only further confuse the issues and postpone what may be inevitable: a direct challenge to the allocation of treaty fishing rights, which would be fully and independently litigated in the Washington I forum.
 
 
 21
 The dissent speculates that if the BIA reverses its decision and recognizes the Samish as an official tribe, this "will undoubtedly carry great weight in any judicial reconsideration of Samish entitlement to treaty fishing rights." In fact, such a decision would have marginal influence at best. The Washington I court need not accord any deference to an agency proceeding that has been expressly limited to matters other than rights under the 1855 treaty. The dissent suggests that we erroneously cling to a "technical legal distinction" between this federal recognition proceeding and possible future action on treaty claims. Yet we conclude that the Tulalip's interests are not practically impaired precisely because each action has an independent legal effect.
 
 
 22
 The dissent mischaracterizes the Samish's action as solely a strategic attempt to gain treaty rights. This may be one of the Samish's goals, but surely not the only one. In their initial complaint, the Samish alleged harm because of the loss of fishing opportunities and the deprivation of "rights and benefits of federally recognized Tribes." Federal recognition brings its own obvious rewards, not the least of which is the eligibility of federal money for tribal programs, social services and economic development.
 
 
 23
 In short, we conclude that the district court resolved the situation in a practical and even-handed manner. Judge Zilly bifurcated the action, dealing first with the Samish efforts to relitigate their treaty successorship rights. After the preliminary summary judgment ruling against the Samish, fishing rights went out of the case. Remaining was only the Samish attempt to achieve federal recognition. On that one issue, the Tulalip have no protectable interest. Judge Zilly accommodated their concerns by allowing their participation as amicus curiae.
 
 B. PERMISSIVE INTERVENTION
 
 24
 The Tulalip moved in the alternative for permissive intervention. We review for an abuse of discretion the denial of that motion. United States v. Oregon, 913 F.2d 576, 589 (9th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 2889, 115 L.Ed.2d 1054 (1991). A court may grant intervention under Fed.R.Civ.P. 24(b) where: (1) the movant shows independent ground for jurisdiction; (2) the motion is timely; and (3) the applicant's claim or defense and the main action have a question of law or fact in common. Venegas v. Skaggs, 867 F.2d 527, 529 (9th Cir.1989), aff'd, 495 U.S. 82, 110 S.Ct. 1679, 109 L.Ed.2d 74 (1990).
 
 
 25
 The district court held that there was no common question of law or fact. We find no abuse of discretion. The Tulalip's fishing interest did not relate to the subject matter of the action remaining before the district court.
 
 
 26
 AFFIRMED.
 
 REINHARDT, Circuit Judge, dissenting:
 
 27
 No one denies the interest of the Tulalip Tribes in the allocation of fishing rights under the 1855 Treaty of Point Elliott. Furthermore, all recognize that such fishing rights play a significant part in the pursuit of this particular litigation by the Samish. Nonetheless, resting its decision upon the "different legal purpose" and "independent legal effect" of this action, the majority affirms the denial of intervention by the Tulalip Tribes. In doing so, the majority abandons the practical inquiry required by precedent in favor of reliance on formalistic distinctions, and retreats from our well-established policy of liberally construing Fed.R.Civ.P. 24 to allow intervention. Because I believe that legal technicality has no place in determining the right to intervene, I dissent.
 
 
 28
 * Prior to 1966, Fed.R.Civ.P. 24(a) prescribed a strict, technical test for intervention of right. A 1966 amendment broadened the rule to allow more applicants to claim the right to intervene. Consistent with this intention, we have repeatedly stated that we "generally construe Rule 24 liberally in favor of potential intervenors." In re Benny, 791 F.2d 712, 721 (9th Cir.1986); see also United States ex. rel. McGough v. Covington Technologies Co., 967 F.2d 1391, 1394 (9th Cir.1992); Scotts Valley Band of Pomo Indians v. United States, 921 F.2d 924, 926 (9th Cir.1990).
 
 
 29
 In addition to mandating broad construction, Rule 24 requires attention to practical considerations, not technical distinctions. United States v. Stringfellow, 783 F.2d 821, 826 (9th Cir.1986) ("we are guided primarily by practical considerations"), vacated on other grounds, 480 U.S. 370, 107 S.Ct. 1177, 94 L.Ed.2d 389 (1987). The 1966 amendment of Rule 24 "import[ed] practical considerations" and "free[d] the rule from undue preoccupation with strict considerations of res judicata." Fed.R.Civ.P. 24 advisory committee note (1966 amendment). Thus, "[w]e have established a practical test which applicants must meet in order to qualify for intervention." United States v. Oregon, 839 F.2d 635, 637 (9th Cir.1988) (emphasis added). Our four-factor test of timeliness, interest, practical impairment, and inadequate representation "essentially mirrors the language" of the Rule itself. McGough, 967 F.2d at 1394. Thus, both the rule and our precedent require that we address a motion for intervention with practical consequences in mind.
 
 
 30
 Because the "interest" factor, upon which the majority rests its affirmance, is simply a threshold requirement, broad and practical construction in favor of potential intervenors is particularly appropriate here.[1] "[T]he criteria of practical harm to the applicant and the adequacy of representation by others are better suited to the task of limiting extension of the right to intervene." County of Fresno v. Andrus, 622 F.2d 436, 438 (9th Cir.1980). "[T]he 'interest' test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." Nuesse v. Camp, 385 F.2d 694, 700 (D.C.Cir.1967), quoted with approval in County of Fresno, 622 F.2d at 438.
 
 
 31
 Thus, practicality and liberality must govern the resolution of the Tulalip Tribes' appeal. Our precedent requires this approach. It is not enough simply to recite the words "practical" and "liberal" in our opinion. We must apply them in the spirit of the concepts they embody. Here, the majority acknowledges that the right to intervention is to be broadly and practically construed, but then ignores this charge in favor of a narrow, technical--and ultimately erroneous--application. By doing so, it disregards the mandate of the rule and our precedents.
 
 
 32
 Even if we were free to apply a different standard, we would be wrong to do so. The well-established emphasis upon practicality and liberality provides a sensible approach to intervention. In the continual debate over the function of the federal courts, there is a recurrent tension, real or imagined, between efficiency and the individual's right of access to a federal judicial forum. On a wide array of legal issues, from collateral review of criminal convictions to challenges of administrative rule-making, justices and other jurisprudential experts tell us that we face a choice between greater efficiency and greater access. Conditioned to the existence of this dichotomy, we often classify jurists by their relative dedication to efficiency or access as the first order of the federal courts. Intervention, however, is one of the rare areas where efficiency and access are in clear accord.
 
 
 33
 A liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts. By allowing parties with a practical interest in the outcome of a particular case to intervene, we often prevent or simplify future litigation involving related issues; at the same time, we allow an additional interested party to express its views before the court.
 
 
 34
 The efficiency rationale in favor of liberalized intervention makes particular sense here. We have previously commented upon the complexity and multiplicity of litigation spawned by the allocation of fishing rights under the Treaty of Point Elliott: "[w]e cannot think of a more comprehensive and complex case than this." United States v. Suquamish Indian Tribe, 901 F.2d 772, 775 (9th Cir.1990) (noting "numerous supplemental proceedings with voluminous filings"). Sprinkled throughout the case books are numerous opinions--appellate and trial court--dealing with the issue. If the Tulalip Tribes were allowed to intervene, future and seemingly inevitable litigation on Samish entitlement to treaty rights might be simplified or even avoided.
 
 
 35
 Nevertheless, the majority affirms the denial of intervention, concluding that this litigation is not sufficiently related to the issue of treaty fishing rights, in which the Tulalip Tribes have an undeniable interest. This holding seems plainly inconsistent with the principles governing the right of interested parties to intervene.
 
 II
 
 36
 There can be no doubt that, as a practical matter, this litigation is about fishing rights under the Treaty of Point Elliott. In their complaint, the Samish heavily focus upon their rights under the 1855 treaty. The complaint describes the Samish as the present-day successor of the tribe "which was a party to the Treaty of Point Elliott." Their allegations of the harms flowing from non-recognition begin with the loss of treaty fishing rights and conclude with the assertion that other Indian tribes are "taking steps to acquire rights to lands and treaty fishing rights of Plaintiffs." Aside from treaty rights, the Samish identify no specific right or benefit they seek through federal recognition.[2] Finally, as the majority describes more fully, the Samish have attempted to use this action to set aside a prior adverse determination of the fishing rights issue.
 
 
 37
 Furthermore, the majority all but concedes that this litigation closely relates to fishing rights when it acknowledges that, should the Samish gain federal recognition, "the next step would be to assert fishing rights as well." This expectation belies any notion that, from a practical perspective, this action is distinct from the treaty fishing rights issue. Rather, the progression from federal recognition to fishing rights is both predictable and logical because of the clear similarity of the factual issues underlying each.
 
 
 38
 Among the prerequisites for federal recognition of an Indian tribe is "establish[ing] that the petitioner has maintained tribal political influence or other authority over its members as an autonomous entity throughout history until the present." 25 C.F.R. § 83.7(c). Although this is only one of numerous criteria, it, like the others, is mandatory--a necessary condition for federal recognition. In contrast, recognition of treaty rights requires "a single necessary and sufficient condition." United States v. Washington, 641 F.2d 1368, 1372 (9th Cir.1981) ("Washington II "), cert. denied, 454 U.S. 1143, 102 S.Ct. 1001, 71 L.Ed.2d 294 (1982). "[T]he group must have maintained an organized tribal structure." Id. The majority acknowledges that these two inquiries are "similar."
 
 
 39
 Beyond mere similarity, however, I would suggest that the two inquiries are indistinguishable; for the Samish or any other tribe descended from a treaty-signer, federal recognition is tantamount to acknowledgement by the federal government of tribal entitlement to treaty rights. The majority notes that federal recognition is not a precondition to receiving treaty rights. That observation is accurate but not particularly significant. It simply reflects the fact that federal recognition entails satisfaction of multiple criteria while treaty rights entitlement involves but one. The majority also states that a tribe need not assert treaty rights to gain federal recognition. That is also true--as far as it goes. But again, it is wholly irrelevant. Tribes may choose to forego treaty rights, or they may have no treaty rights to claim because they are not descended from signatories of treaties; still, they are free to seek and receive federal recognition. We know, however, that the Samish fall within neither category.
 
 
 40
 The question of most relevance here is whether federal recognition necessarily qualifies for treaty rights a tribe that claims them. The answer is apparent. If the single necessary and sufficient criterion for treaty rights is also a necessary condition for federal recognition, then achieving the latter necessarily satisfies the single qualification for the former. This is a logical calculus of general applicability. Thus, a tribe seeking entitlement to treaty rights may well decide, as a first step, to obtain federal recognition.
 
 
 41
 For the Samish, however, there is an even more specific reason why pursuit of federal recognition must seem a logical precursor to the reassertion of their entitlement to treaty fishing rights. In 1981, reviewing the rejection of the claims of several tribes, including the Samish, as successors to signers of the Treaty of Point Elliott, we noted that the factors relied upon by the district court in addressing the tribes' claims seemed to depend heavily--and wrongly--upon federal nonrecognition of the claiming tribes. See Washington II, 641 F.2d at 1372. By divided vote, we nonetheless upheld the district court's rejection of the tribes' claims. One member of the court, in dissent, remarked that "[i]t seems evident ... that the 'attributes of sovereignty' found to be lacking in the Samish Tribe are those arising from federal recognition." Id. at 1375 (Canby, J., dissenting).
 
 
 42
 Both the general comments in the Washington II majority opinion and the dissent's specific observation as to the Samish would seem positive invitations to achieve federal recognition first, and then to seek reconsideration of their entitlement to Point Elliott fishing rights. This specific incentive, coupled with the general, logical link between tribal recognition and treaty rights, demonstrates the practical and plain junction between the case before us and the issue of fishing rights under the 1855 treaty. In light of the general principles of liberality and practicality, the Tulalip Tribes' interest in intervention is manifest.
 
 III
 
 43
 The majority concludes that the district court properly denied intervention because recognition does not "self-execute" treaty rights claims, and because the Samish will have to relitigate treaty rights in separate litigation challenging the prior adverse determination of the issue. This technical--and technically accurate--procedural separation cannot support the denial of intervention.
 
 
 44
 Possible stare decisis effects alone may warrant intervention of right.[3] See Stringfellow, 783 F.2d at 826; see also Oregon, 839 F.2d at 638. Thus, our precedent requires us to look to the practical effect of factual or legal determinations in the current litigation upon possible future litigation in which the potential intervenor has an interest. Under the revised Rule 24, the technical inapplicability of the principles of claim or issue preclusion does not prevent intervention; the potential intervenor's interest in avoiding stare decisis--a species of practical preclusion--suffices to create a right to intervene. See Smith v. Pangilinan, 651 F.2d 1320, 1325 (9th Cir.1981); cf. McGough, 967 F.2d at 1396 (reversing denial of intervention on grounds of stare decisis without reaching applicability of preclusion principles). As described above, the factual determinations underlying federal recognition include the single determination that is necessary to a finding of entitlement to treaty fishing rights.
 
 
 45
 It is true, as the majority points out, that after the grant of partial summary judgment, the remaining issues in this case apparently involve only alleged defects in the administrative process that resulted in the denial of federal recognition to the Samish. Even assuming--a somewhat dubious assumption--that the Tulalip Tribes' interest is properly assessed under the assumption that the litigation will always be so limited, the district court should have granted intervention. Cf. Sagebrush Rebellion, Inc. v. Watt, 713 F.2d 525, 528 (9th Cir.1983) (rejecting "novel proposition that the intervenor's interest ... [is] measured in relation to the particular issue before the court at the time of the motion and not in relation 'to the subject of the action' as provided in Rule 24").
 
 
 46
 The Tulalip Tribes have an obvious interest in protecting from reconsideration the previous determination of the Bureau of Indian Affairs (BIA). Whether we call it "stare decisis," "comity," or--most appropriate in this case--"administrative deference," the right of intervention recognizes the practical future effect of contemporary determinations. Cf. International Union v. Scofield, 382 U.S. 205, 213, 86 S.Ct. 373, 379, 15 L.Ed.2d 272 (1965) (recognizing intervenor interest in avoiding future deference whether "as a matter of stare decisis or comity"). As a practical matter, if the BIA reconsiders its earlier decision, granting federal recognition to the Samish, the agency's determination that the Samish have "maintained tribal political influence or other authority," 25 C.F.R. § 83.7(c), will undoubtedly carry great weight in any judicial reconsideration of Samish entitlement to treaty fishing rights. Consequently, the Tulalip Tribes have a strong interest in seeing that the BIA not be required to reconsider its prior determination. The majority, relying on a technical legal distinction between this action and possible future action regarding treaty fishing rights, ignores this obvious practical interest of the Tulalip Tribes. Their opinion certainly does not give a liberal construction to the intervention rule.
 
 IV
 
 47
 Because Rule 24 and our precedent mandate recognition of the Tulalip Tribes' interest in opposing reconsideration of Samish eligibility for federal recognition, I would reverse the denial of intervention. I respectfully dissent.
 
 
 
 *
 Bruce Babbitt is substituted for Manuel Lujan as Secretary of the Interior, pursuant to Fed.R.App.P. 43(c)(1)
 
 
 [1]
 Rule 24(a) reads
 Upon timely application anyone shall be permitted to intervene in an action ... (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.
 
 
 [2]
 This case is accordingly distinguishable from Scotts Valley Band of Pomo Indians v. United States, 921 F.2d 924 (9th Cir.1990), relied on by the Tulalip. In Scotts Valley Band, we held that the City of Chico had a right to intervene in the Band's suit to restore its land to federal trust status because trust status would necessarily result in the City's losing its power to tax and zone the lands
 
 
 [3]
 Indeed, if the Tulalip's interests were as practically impaired as the dissent suggests, then the other treaty tribes might have to be joined in this action as indispensable parties under Fed.R.Civ.P. 19
 
 
 [1]
 Some of the considerations taken up by the majority are probably more appropriately classified as "practical impairment" concerns. However, since the majority affirms the district court on the basis of the second intervention factor rather than the third, I will focus my discussion upon "interest." As should be apparent from the discussion of stare decisis below, I believe that the Tulalip Tribes satisfy the "impairment" factor as well
 
 
 [2]
 While I agree with the majority that the Samish would acquire certain "rewards" that flow from federal recognition, I think that a fair reading of the complaint as a whole makes it eminently clear that the Samish's primary purpose in instituting the administrative proceeding was to pursue their fishing rights claim
 
 
 [3]
 I here address "stare decisis" in a manner different from the majority's treatment. Our cases have treated stare decisis in the intervention context as referring to the possible effect of the litigation in which the applicant seeks to intervene upon future litigation. See, e.g., Oregon, 839 F.2d at 638 (determinations "will have a persuasive stare decisis effect in any parallel or subsequent litigation"). This is how I employ the term. The majority treats stare decisis as referring to the protection of the effects of past litigation on the current litigation