**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
             *Plaintiff-Appellee,*

             v.

STATE OF WASHINGTON; SWINOMISH
TRIBAL COMMUNITY; LUMMI
NATION; UPPER SKAGIT INDIAN
TRIBE; THE TULALIP TRIBES; PORT
GAMBLE S'KLALLAM TRIBE;
JAMESTOWN S'KLALLAM TRIBE;
CONFEDERATED TRIBES AND
BANDS OF THE YAKAMA INDIAN
NATION,
             *Defendants-Appellees,*

             v.

SAMISH INDIAN TRIBE,
             *Movant-Appellant.*

No. 08-35794
D.C. Nos.
2:01-sp-00002-RSM
2:70-cv-09213-RSM

ORDER DENYING
MOTION FOR
CLARIFICATION
AND AMENDING
OPINION AND
AMENDED
OPINION

Appeal from the United States District Court
for the Western District of Washington
Ricardo S. Martinez, District Judge, Presiding

Argued and Submitted
September 22, 2009—San Francisco, California

Filed December 11, 2009
Amended January 27, 2010

Before: Alex Kozinski, Chief Judge, Mary M. Schroeder,
William C. Canby, Jr., Stephen Reinhardt,
Andrew J. Kleinfeld, Kim McLane Wardlaw,
William A. Fletcher, Marsha S. Berzon,
Johnnie B. Rawlinson, Richard R. Clifton and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Canby

## COUNSEL

Elizabeth Ann Peterson, Attorney, Department of Justice, Washington, D.C., for the plaintiff-appellee.

Mason D. Morisset, Morisset, Schlosser, Jozwiak & McGaw, Seattle, Washington; James M. Jannetta, Swinomish Indian Tribal Community, La Conner, Washington; Harold Chesnin, Office of the Tribal Attorney Upper Skagit Indian Tribe, Sedro Woolley, Washington; for defendant-appellee Treaty Tribes.

Craig J. Dorsay, Dorsay & Easton, LLP, Portland, Organ, for the movant-appellant.

Alexandra K. Smith, Lane Powell, PC, Seattle, Washington, for the amicus curiae.

## ORDER

The opposed motion of the Samish Indian Tribe for clarification of the opinion filed in this matter on December 11, 2009, is DENIED.

\* \* \* \*

The opinion filed in this matter on December 11, 2009, slip op. 16399, is amended as follows:

At slip op. 16410, first full paragraph, line 4: Insert ", according to *Greene III*," after "Samish Tribe's history which."

At slip op. 16410, first full paragraph, line 7: Delete "*id.* § 83.7(a)" and substitute therefor "25 C.F.R. § 83.7(a)."

At slip op. 16410, first full paragraph, line 14: Delete "25 C.F.R. § 83.7(e)" and substitute therefor: "*id.* § 83.7(e)."

\* \* \* \*

No petitions for rehearing, rehearing en banc, or rehearing before the full court are pending.

No subsequent petitions for rehearing, rehearing en banc, or rehearing before the full court may be filed.

---

## OPINION

CANBY, Circuit Judge:

### INTRODUCTION

This appeal presents one more chapter in the litigation over Indian treaty fishing rights in the Pacific Northwest. The appellant Samish Tribe claims to be a successor to a tribe that entered the Treaty of Point Elliott, 12 Stat. 927 (1855), with the United States. In 1974, the Samish Tribe intervened in the foundational treaty rights case of *United States v. Washington*, 384 F. Supp. 312 (W.D. Wash. 1974) ("*Washington I*"), *aff'd*,

520 F.2d 676 (9th Cir. 1975), in order to establish its entitlement to treaty fishing rights. At that time, the Samish Tribe had not been recognized by the federal government. The district court rejected the Tribe's claim to treaty rights, finding that the Samish Tribe had not "lived as a continuous separate, distinct and cohesive Indian cultural or political community" and was not "descended from any of the tribal entities that were signatory to the Treaty of Point Elliott." *United States v. Washington*, 476 F. Supp. 1101, 1106 (W.D. Wash. 1979) ("*Washington II*"), *aff'd*, 641 F.2d 1368 (9th Cir. 1981).

Nearly twenty years later, in connection with separate litigation, the Samish Tribe succeeded in obtaining federal recognition.[1] *See* Final Determination for Federal Acknowledgment of the Samish Tribal Organization as an Indian Tribe, 61 Fed. Reg. 15,825 (Apr. 9, 1996) ("*Samish Recognition*"); *Greene v. Babbitt*, 943 F. Supp. 1278 (W.D. Wash. 1996) ("*Greene III*"). The Tulalip Tribes, which possessed treaty fishing rights and feared their dilution, were denied intervention in the Samish recognition proceedings on the ground that recognition could not affect treaty rights. *Greene v. United States*, 996 F.2d 973 (9th Cir. 1993) ("*Greene I*"). In 2002, the Samish Tribe returned to the *Washington* litigation and sought, on the basis of its federal recognition, relief under Federal Rule of Civil Procedure 60(b) from the 1979 judgment in *Washington II*. The district court denied relief. We reversed, holding that the intervening federal recognition was an extraordinary circumstance permitting the reopening of the 1979 decision under Rule 60(b)(6). *United States v. Washington*, 394 F.3d 1152, 1161 (9th Cir. 2005) *("Washington III")*.

On remand, the district court again denied Rule 60(b)

---

[1]Federal recognition is now referred to as federal "acknowledgment" under the regulatory scheme of the Department of the Interior. *See* 25 C.F.R. pt. 83 (2009). For simplicity, we continue to refer to "recognition," which was the phrase in use at the time of *Washington I* and *II*.

relief, and the Samish Tribe again appeals. For reasons we now set forth, we affirm the judgment of the district court. In doing so, we resolve a conflict in our precedent between *Washington III*, which held that recognition was an extraordinary circumstance justifying the reopening of *Washington II*, and our cases holding that federal recognition is an independent process that has no effect on treaty rights. *See Greene I,* 996 F.2d at 977; *Greene v. Babbitt*, 64 F.3d 1266, 1270-71 (9th Cir. 1995) ("*Greene II*"). We resolve the conflict in favor of the *Greene* proposition: recognition proceedings and the fact of recognition have no effect on the establishment of treaty rights at issue in this case.

## FACTUAL AND LEGAL BACKGROUND

### 1.  *Off-Reservation Treaty Fishing Rights*

During the 1850s Governor Stevens of Washington Territory negotiated a number of treaties with Northwest Indian tribes. The Treaty of Point Elliott was typical of those treaties in guaranteeing the signatory tribes "[t]he right of taking fish at usual and accustomed grounds and stations . . . in common with all citizens of the Territory." 12 Stat. at 928. In *Washington I*, the seminal case construing this clause, the district court held that, with small exceptions, the treaty clause reserved to the Indians the right to take fifty percent of the annual harvestable runs of salmon and steelhead trout.[2] 384 F. Supp. at 343. It further held that fourteen tribes or bands, not including the present Samish Tribe, were entitled to off-reservation treaty fishing rights as political successors to tribes that had signed treaties guaranteeing tribal fishing rights. *Id.* at 406. Two of the tribes so entitled, the Stillaguamish and Upper Skagit Tribes, were not federally recognized. *Id.* at 378-79.

---

[2]This division of the fishery was ultimately upheld by the Supreme Court in *Washington v. Washington State Comm. Passenger Fishing Vessel Ass'n*, 443 U.S. 658 (1979).

### 2.   *Initial Denial of Samish Tribe Treaty Status*

Shortly thereafter, the Samish Tribe intervened in the *Washington* litigation and sought to establish its entitlement to treaty fishing rights. At that time, the Samish Tribe was not federally recognized.[3] The district court denied relief. *Washington II*, 476 F. Supp. at 1106. The district court found that the Samish Indians, then numbering between 98 and 150 persons, were a party to the Treaty of Point Elliott. *Id.* at 1105-06. They were not named in the Treaty, but were signed for by the Lummi Tribe representative. *Id.* at 1106. The court further found:

> Pursuant to the treaty most of the Samish people initially moved to the Lummi Reservation. Later others moved to the Swinomish Reservation. The present-day Lummi and Swinomish Reservation tribes include descendants of the 1855 Samish Indians.

*Id.* The court held, however, that "[t]he Intervenor Samish Tribe is not an entity that is descended from any of the tribal entities that were signatory to the Treaty of Point Elliott." *Id.* The court noted the Samish's lack of federal recognition and further stated:

> The Intervenor's membership roll contains 549 persons many of whom are of only 1/16th degree Indian blood. Two have only 1/32nd Samish blood. The tribe does not prohibit dual membership and at least one member is an officer of the Lummi Tribe.
>
> [ ] The members of the Intervenor Samish Tribe and their ancestors do not and have not lived as a contin-

---

[3]Four other federally unrecognized tribes intervened along with the Samish Tribe: the Duwamish, Snohomish, Snoqualmie, and Steilacoom Tribes. All were unsuccessful in establishing entitlement to treaty fishing rights. *Washington II*, 476 F. Supp. at 1111.

uous separate, distinct and cohesive Indian cultural or political community. The present members have no common bond of residence or association other than such association as is attributable to the fact of their voluntary affiliation with the Intervenor entity.

*Id.* (internal citations omitted). The court accordingly concluded that the Samish Tribe was not "at this time a treaty tribe in the political sense" within the meaning of *Washington I* and did not "presently hold[ ] for itself or its members fishing rights secured by any of the Stevens treaties identified in [*Washington I*]." *Id.* at 1111. The district court also concluded that "[o]nly tribes recognized as Indian political bodies by the United States may possess and exercise the tribal fishing rights secured and protected by the treaties of the United States." *Id.* This last conclusion was surprising because it was wholly inconsistent with the district court's ruling in *Washington I* that two unrecognized tribes were entitled to treaty fishing rights. 384 F. Supp. at 378-79, 406.

On appeal, we affirmed the denial of treaty rights. *United States v. Washington*, 641 F.2d 1368 (9th Cir. 1981). We pointed out the district court's error in stating that federal recognition is a prerequisite to the enjoyment of treaty rights: "[t]his conclusion is clearly contrary to our prior holding [affirming *Washington I*] and is foreclosed by well-settled precedent." *Id.* at 1371. We nevertheless held that the district court's factual findings supported the denial of relief:

> [T]he district court specifically found that the appellants had not functioned since treaty times as "continuous separate, distinct and cohesive Indian cultural or political communit[ies]."
>
> After close scrutiny, we conclude that the evidence supports this finding of fact. Although the appellants now have constitutions and formal governments, the governments have not controlled the lives of the

members. Nor have the appellants clearly established the continuous informal cultural influence they concede is required.

*Id.* at 1373 (internal citation omitted) (second alteration in original).[4]

### 3. *Federal Recognition of the Samish Tribe; Treaty Tribes Denied Intervention to Oppose Recognition*

The Samish Tribe first sought federal recognition in 1972, but no action was taken on the application. In 1978, the Department of the Interior adopted rules establishing a process for tribes to achieve federal recognition, known in the regulations as federal "acknowledgment." Procedures for Establishing That an American Indian Group Exists as an Indian Tribe, 43 Fed. Reg. 39,361, 39,363 (Sept. 5, 1978).[5] The Samish Tribe then filed a revised application.

On February 5, 1987, the Department of the Interior published a "Final Determination That the Samish Indian Tribe Does Not Exist as an Indian Tribe." 52 Fed. Reg. 3709. A major reason for the denial was that the Tribe had failed to meet two mandatory requirements for recognition: (1) "that a substantial portion of the petitioning group inhabits a specific area or lives in a community viewed as American Indian and distinct from other populations in the area, and that its members are descendants of an Indian tribe which historically inhabited a specific area"; and (2) "that the petitioner has maintained tribal political influence or other authority over its members as an autonomous entity throughout history until the

---

[4]One judge (the present writer) dissented from our decision, contending that the district court's erroneous conclusion of law requiring federal recognition tainted its factual findings, *id.* at 1374-76 (Canby, J. dissenting), but the majority clearly did not accept that view.

[5]The current version of the acknowledgment regulations may be found at 25 C.F.R. pt. 83 (2009).

present." 43 Fed. Reg. at 39,363.[6] The Department's decision was made on the papers; the regulation did not provide for a hearing and gave the applicant no right to see the submissions of others.

The Samish Tribe then brought an action in district court challenging the administrative denial of recognition. The Tulalip Tribes, which had treaty fishing rights, attempted to intervene on the ground that recognition of the Samish Tribe would threaten the Tulalips' treaty fishing rights. *See Greene I*, 996 F.2d at 975. The district court ruled that the Samish Tribe could not, in its challenge to denial of recognition, relitigate *Washington II*'s denial of treaty fishing rights. *See id.* The district court then denied intervention, and the Tulalip Tribes appealed. *See id.* at 976.

We upheld the denial of intervention, rejecting the Tulalips' argument that the factual inquiries underlying recognition were so similar to the inquiries underlying treaty rights that recognition was bound to affect treaty rights. We stated:

> We recognize that the two inquiries are similar. Yet each determination serves a different legal purpose and has an independent legal effect. Federal recognition is not a threshold condition a tribe must establish to fish under the Treaty of Point Elliott . . . .

> Similarly, the Samish need not assert treaty fishing rights to gain federal recognition . . . . Even if they obtain federal tribal status, the Samish would still have to confront the decisions in *Washington I and II* before they could claim fishing rights. Federal recognition does not self-execute treaty rights claims.

---

[6]These requirements continue in slightly modified form today. *See* 25 C.F.R. § 83.7(b) & (c) (2009).

*Id.* at 976-77.

Meanwhile, the district court had ruled that the Samish had been denied due process in the administrative proceeding, and remanded for a formal adjudication under the Administrative Procedure Act. *See Greene v. Lujan*, No. C89-645Z, 1992 WL 533059 (W.D. Wash. Feb. 25, 1992). The Secretary of the Interior appealed that decision. The Tulalip Tribes, as amici curiae, again argued that recognition of the Samish was barred by *Washington II*. We rejected that contention and affirmed the district court in *Greene II*. We stated:

> Our decision in *Greene v. United States*, 996 F.2d 973 (9th Cir. 1993), can leave no serious doubt that our court regards the issues of tribal treaty status and federal acknowledgment as fundamentally different. We there held that the Tulalip Tribe was not entitled to intervene in this very litigation. We did so because the Tulalip's interest in preventing the Samish from gaining treaty fishing rights was not affected by this litigation, involving federal tribal recognition or, as it is termed in the applicable regulation, "acknowledgment."

*Greene II*, 64 F.3d at 1270. We further observed that we had denied intervention by the Tulalip Tribes in *Greene I* "because we disagreed with their position that Samish success in the [recognition case] would undermine the finality of the *Washington II* decision." *Id.* at 1271. After further consideration of the merits, we then upheld the district court's ruling that due process entitled the Samish Tribe to a hearing on its application for recognition. *Id.* at 1275.

In administrative proceedings that followed, an Administrative Law Judge held that the Samish Tribe was entitled to federal recognition. The judge included several findings tracing the Samish Tribe's history which, according to *Greene III*, supported the mandatory recognition criteria that: (1) the

group "has been identified as an American Indian entity on a substantially continuous basis since 1900," 25 C.F.R. § 83.7(a); (2) the group "comprises a distinct community and has existed as a community from historical times until the present," *id.* § 83.7(b); (3) the tribe has "maintained political influence or authority over its members," *id.* § 83.7(c); and (4) "[t]he petitioner's membership consists of individuals who descend from a historical Indian tribe or from historical Indian tribes which combined and functioned as a single autonomous political entity," *id.* § 83.7(e). *See Greene III*, 943 F. Supp. at 1283-84. The Assistant Secretary of the Interior, however, after an ex parte conference with a government lawyer and expert witness, approved the recognition of the Samish Tribe but deleted several of the crucial findings of the Administrative Law Judge underlying the determination that the Samish had met the regulatory requirements. *See id.* at 1282-83; *Samish Recognition*, 61 Fed. Reg. at 15,825.

The Samish Tribe thereupon returned to district court, objecting to the deletion of the Administrative Law Judge's findings. The district court held the ex parte contacts to be unlawful, and reinstated the disputed findings of the Administrative Law Judge. *Greene III*, 943 F. Supp. at 1288-89.[7]

4. *The Samish Tribe Moves to Reopen the Treaty Rights Denial;* Washington III.

In 2002, armed with its federal recognition, the Samish Tribe filed a motion in district court to reopen *Washington II*. *See Washington III*, 394 F.3d at 1156. The motion was filed pursuant to Federal Rule of Civil Procedure 60(b), which pro-

---

[7]The Treaty Tribes contend that the Samish Tribe misled the district court into mistaking the text of the disputed findings of the Administrative Law Judge. We are satisfied, however, that the district court here was correct in holding that the district court in Greene III reinstated the actual findings of the Administrative Law Judge, not some inaccurate description thereof.

vides that a court may relieve a party from a final judgment for certain specified reasons or, in a catchall provision, for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). Several tribes that currently hold treaty fishing rights ("the Treaty Tribes") opposed the motion. *Washington III*, 394 F.3d at 1156. The district court denied relief.

The Samish appealed, and we reversed. We recognized that the catchall provision of Rule 60(b) " 'has been used sparingly as an equitable remedy to prevent manifest injustice' and 'is to be utilized only where extraordinary circumstances prevented a party from taking timely action to prevent or correct an erroneous judgment.' " *Id.* at 1157 (quoting *United States v. Alpine Land & Reservoir Co.*, 984 F.2d 1047, 1049 (9th Cir. 1993)). We held that, in light of the circumstances of the earlier denial of treaty rights for the Samish Tribe, its subsequent federal recognition was an "extraordinary circumstance" justifying Rule 60(b) relief. *Id.* at 1161. The key point was not the recognition itself, but the factual findings underlying the recognition, notably the findings that the Samish Tribe " 'has been continuously identified throughout history as Indian or aboriginal, has existed as a distinct community since first sustained European contact, has maintained political influence within itself as an autonomous entity and that 80 percent of its members are descendants of the historical Samish tribe.' " *Id.* at 1160 (quoting 61 Fed. Reg. 15825, 15826).

We noted that, if the Samish Tribe had been recognized at the time it first sought an adjudication of treaty rights, it "almost certainly" would have succeeded. *Id.* at 1159. We further stated:

> In light of the government's "excessive delays and . . . misconduct" in withholding of recognition from the Samish, a circumstance beyond their control; the government's position in *Washington II* that federal recognition was necessary and that future federal

recognition might justify revisiting the treaty rights issue; and the district court's erroneous conclusion that nonrecognition was decisive and wholesale adoption of the United States' boiler-plate findings of fact in *Washington II*, we conclude that the Samish were effectively prevented from proving their tribal status "in a proper fashion."

*Id.* (alteration in original). We also noted:

Although we have previously held that federal recognition is not *necessary* for the exercise of treaty fishing rights by a signatory tribe, we have never held that federal recognition is not a *sufficient* condition for the exercise of those rights. Indeed, our precedent leads us to the inevitable conclusion that federal recognition is a sufficient condition for the exercise of treaty rights.

*Id.* at 1157-58. The reason, we said, was that treaty rights require that a signatory group has maintained an organized tribal structure from treaty times to the present, and recognition requires that a group be a distinct community that has existed from historical times to the present and maintained political influence or authority over its members during that time. *Id.* at 1158. Because the Samish were parties to the treaty, recognition of the Samish Tribe established that they were successors to the treaty status. *Id.* at 1160.

Finally, we ruled that the district court's concerns for the finality of judgments did not justify denial of the Samish's motion to reopen *Washington II*: "Unlike a judgment between private parties, the allocation of natural resources between treaty tribes and others cannot help but be an ongoing venture." *Id.* at 1162. We accordingly reversed the district court's order and remanded for further proceedings consistent with our opinion. *Id.*

5.  *The District Court's Decision on Remand, Now Under Review*

On remand after our decision in *Washington III*, the district court again denied the Samish Tribe's motion to reopen *Washington II*. It recited at length the findings of *Washington II* that the present Samish Tribe had not maintained an organized tribal structure and was not a successor to the Samish Tribe that had secured treaty rights in 1855. The district court also noted that reopening on the ground of the intervening recognition of the Samish Tribe would conflict with the *Greene* cases in which we denied intervention of treaty tribes in the Samish recognition proceedings because recognition would have no effect on treaty rights. The district court reiterated its original view that considerations of finality supported denial because reopening would be hugely disruptive to the regime of treaty fishing that had been established in the wake of *Washington II*.[8]

The Samish Tribe again appealed.

## DISCUSSION

In ruling on remand that considerations of finality required it to deny reopening of *Washington II*, the district court clearly violated the mandate of *Washington III*. The considerations of finality cited by the district court had all been considered and rejected by our court in *Washington III*, as had our decisions in the *Greene* cases. We do not condone devia-

---

[8]The district court also added two new grounds for denial of reopening. The first was untimeliness, reflected in the delay between the federal recognition of the Samish Tribe in 1996 and its motion to reopen filed in 2002. The second ground was inequitable conduct by the Samish Tribe in misstating and manipulating the findings of the Administrative Law Judge during the district court's review of the reinstatement proceedings. Our disposition of this appeal makes it unnecessary for us to address these rulings.

tion from our mandates because of a disagreement with this court's reasoning.

That having been said, this appeal presents us with a clear conflict in our precedent that gave difficulty to the district court here and would give difficulty to other district courts in the future if we did not address it. For that reason, we voted to convene this en banc court to resolve this appeal in the first instance.[9]

The nature and severity of the conflict in our precedent should be apparent from our perhaps-too-lengthy recital above of the history of this litigation. On the one hand, we have *Greene I* and *II*, which denied treaty tribes the right to intervene in the Samish Tribe's recognition proceedings because recognition could have no effect on treaty rights. On the other hand, we have *Washington III*, which ruled that the fact of recognition of the Samish Tribe was an extraordinary circumstance that justified reopening *Washington II. Washington III* further opined that recognition of the Samish Tribe was a *sufficient* condition for the establishment of treaty fishing rights.

Each of these two conflicting lines of authority has something to be said for it, but the two cannot coexist. We con-

---

[9]This appeal was initially argued to a three-judge panel, but the conflict in our precedent led us to rehear the matter en banc without awaiting a three-judge decision. *See Atonio v. Wards Cove Packing Co.*, 810 F.2d 1477, 1478-79 (9th Cir. 1987) (en banc). This step was necessary because, even if the panel could have revisited *Washington III* under one of the exceptions to law of the case, *see Jeffries v. Wood*, 114 F.3d 1484, 1489 (9th Cir. 1997) (en banc), it still would have been bound by that published opinion as the law of the circuit, *see, e.g.*, *Old Person v. Brown*, 312 F.3d 1036, 1039 (9th Cir. 2002) ("[W]e have no discretion to depart from precedential aspects of our prior decision in *Old Person I*, under the general law-of-the-circuit rule.").

clude that *Washington III* must yield, and we overrule that decision.[10] We address the conflicting decisions in turn.

*Washington III*

**[1]** A primary reason why *Washington III* decided to permit reopening of *Washington II* was that the Samish Tribe had been effectively prevented from proving its tribal treaty status " 'in a proper fashion.' " 394 F.3d at 1159 (citation omitted). Contributing to that view was the litigating posture of the United States in *Washington II*, which asserted that federal recognition was essential to the establishment of treaty rights and that, if the Samish were later recognized, the treaty rights issue might be revisited. *See id.* Those conclusions of *Washington III*, however, were inconsistent with this court's earlier ruling in the appeal of *Washington II*.

**[2]** This court in affirming *Washington II* flatly rejected the ruling of the district court that federal recognition was required for treaty status. 641 F.2d at 1371 ("This conclusion is clearly contrary to our prior holding and is foreclosed by well-settled precedent."). We held, however, that the crucial finding of fact justifying the denial of treaty rights was the district court's finding "that the [Samish] had not functioned since treaty times as 'continuous separate, distinct and cohesive cultural or political communit[ies].' " *Id.* at 1373 (citation omitted) (second alteration in original). As the district court in the present case pointed out, this factual finding had been made by a special master after a five-day trial, and had been made again by the district judge de novo after an eviden-

---

[10]The decision of *Washington III* does not bind us as the law of the case. It is "clearly established" that a three-judge panel decision that is the law of the case for subsequent three-judge panels "does not bind the en banc court." *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341 F.3d 987, 995 (9th Cir. 2003) (en banc).

tiary hearing. On appeal, "[a]fter close scrutiny, we conclude[d] that the evidence supports this finding of fact." *Id.*[11]

Nor was there any reason why the Samish Tribe lacked incentive to present in *Washington II* all of its evidence supporting its right to successor treaty status. The Stillaguamish and Upper Skagit Tribes had been found to have treaty rights in *Washington I*, despite their unrecognized status. There was no reason for the Samish Tribe to hold back any evidence at that time, nor do they now offer any underlying evidence that was subsequently brought to light and could not have been known at the time of *Washington II*.

**[3]** Instead, the Samish Tribe now seeks reopening under Rule 60(b) on the ground that an administrative body has come to a conclusion inconsistent with the factual finding finally adjudicated by this court in *Washington II*. We have been directed to no authority upholding relief from judgment under Rule 60(b) on such a ground.

**[4]** There are good reasons why reopening under Rule 60(b)(6) is permitted only on a showing of "extraordinary circumstances." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988). In *United States v. Alpine Land & Reservoir Co.*, for example, we denied Rule 60(b)(6) relief from a complex decree adjudicating water rights to a river. 984 F.2d at 1050. We stated that "[p]articipants in water adjudications are entitled to rely on the finality of decrees as much as, if not more than, parties to other types of civil judgments." *Id.* Similar considerations of finality loom especially large in

---

[11]In 1993, three of the tribes, not including the Samish Tribe, that had been denied treaty rights in *Washington II* sought relief from the judgment on the ground that the district judge may have been impaired by Alzheimer's disease at the time of the decision. In denying relief on grounds of finality and insufficient evidence to support the claim, we noted that the magistrate judge and this court had both examined the evidence in *Washington II* and found that it supported the ruling. *United States v. Washington*, 98 F.3d 1159, 1163-64 (9th Cir. 1996).

this case, in which a detailed regime for regulating and dividing fishing rights has been created in reliance on the framework of *Washington I*. The district court has twice made compilations of substantive orders entered in the wake of *Washington I. See United States v. Washington*, 459 F. Supp. 1020 (W.D. Wash. 1978); *United States v. Washington*, 626 F. Supp. 1405 (W.D. Wash. 1985). By 1985, seventy-two substantive orders had been entered. Although such a complex regime does not preclude a new entrant who presents a new case for recognition of treaty rights, it certainly cautions against relitigating rights that were established or denied in decisions upon which many subsequent actions have been based.

The potential disruption and possible injury to existing treaty rights that might follow from reopening the denial of the Samish Tribe's treaty claims in *Washington II* is not confined to mere across-the-board dilution of the shares of total harvest of all treaty tribes. The treaties guarantee the right to take fish at "usual and accustomed . . . stations" of each treaty tribe. The claims of the Samish Tribe necessarily compete with those of treaty tribes held to be successors of the treaty Samish, who now fish at the customary stations of the Samish at treaty times. The impact of new claims asserted as Samish claims will have a particularly severe impact on such treaty tribes.[12]

[5] For all of these reasons, we conclude that the Samish Tribe is not entitled to reopening of *Washington II* because of

---

[12]In an effort to minimize disruption, the Samish Tribe at one point asserted that it "would agree to exercise treaty fishing rights under the orders in the case that apply to these three tribes [who are successors to Samish treaty rights], and under the regulatory authority and framework of the three tribes." *Washington III*, 394 F.3d at 1161. This concession, however, was withdrawn on remand following *Washington III*. In any event, it would potentially disturb treaty fishing of the tribes now exercising Samish treaty rights to have the newly recognized Samish Tribe join them.

their subsequent federal recognition. Reopening on this ground is inconsistent with the considerations of finality that have led the Supreme Court and this court to confine the reach of Rule 60(b)(6). The Samish Tribe had a factual determination finally adjudicated against it in *Washington II*. The fact that a subsequent administrative ruling for another purpose may have made underlying inconsistent findings is no reason for undoing the finality of the *Washington II* factual determinations.

Nothing we have said precludes a newly recognized tribe from attempting to intervene in *United States v. Washington* or other treaty rights litigation to present a claim of treaty rights not yet adjudicated. Such a tribe will have to proceed, however, by introducing its factual evidence anew; it cannot rely on a preclusive effect arising from the mere fact of recognition. In *Greene II*, we denied any estoppel effect of *Washington II* on the Samish Tribe's recognition proceeding, because treaty litigation and recognition proceedings were "fundamentally different" and had no effect on one another. *Greene II*, 64 F.3d at 1270. Our ruling was part of a two-way street: treaty adjudications have no estoppel effect on recognition proceedings, and recognition has no preclusive effect on treaty rights litigation.[13] Indeed, to enforce the assurance in *Greene II* that treaty rights were "not affected" by recognition proceedings, the fact of recognition cannot be given even presumptive weight in subsequent treaty litigation. To rule otherwise would not allow an orderly means of protecting the rights of existing treaty tribes on the one hand, and groups seeking recognition on the other.

---

[13]Collateral estoppel would not apply in any event against an entity that was not a party or in privity with a party to the prior litigation. *See Collins v. D.R. Horton, Inc.*, 505 F.3d 874, 882 n.8 (9th Cir. 2007). Moreover, offensive collateral estoppel is a discretionary doctrine, *see id.* at 882, and the circumstances here justify denying its effect.

*Greene I and II*

The nature of recognition proceedings in general and the Samish recognition proceeding in particular make us especially reluctant to reopen an adjudicated treaty decision on the strength of the subsequent recognition of the Samish Tribe. As we have already recited, we denied the Tulalip Tribes intervention in the Samish recognition proceedings on the ground that the "Tulalip's interest in preventing the Samish from gaining treaty fishing rights was not affected by this litigation, involving federal tribal recognition . . . ." *Greene II*, 64 F.3d at 1270. We explained that, in *Greene I*, we had "denied the Tulalip the right to intervene in this [recognition] litigation because we disagreed with their position that Samish success in the case at bar would undermine the finality of the *Washington II* decision." *Id.* at 1271. After these assurances, it is surely improper for us to accord the recognition decision the effect of reopening *Washington II*.

**[6]** There are good reasons for adhering to the rule that treaty tribes are not entitled to intervene in recognition decisions to protect against possible future assertions of treaty rights by the newly recognized tribe, whether or not that tribe has previously been the subject of a treaty rights decision. Recognition, or "acknowledgment," serves a host of purposes for the group that succeeds in achieving it. It establishes a "government-to-government relationship" between the recognized tribe and the United States. 25 C.F.R. § 83.2. It is a "prerequisite to the protection, services, and benefits of the Federal government available to Indian tribes by virtue of their status as tribes." *Id.* "Federal recognition brings its own obvious rewards, not the least of which is the eligibility of federal money for tribal programs, social services and economic development." *Greene I*, 996 F.2d at 978.

**[7]** It interjects unnecessary and distracting considerations into recognition proceedings if treaty tribes find it necessary or are permitted to intervene to protect against future assertion

of treaty rights by the tribe seeking recognition. Such intervention has the potential to interfere unnecessarily with a tribe's establishing its entitlement to recognition because of the speculative possibility that some administrative finding might have an impact on future treaty ligitation. The best way of avoiding such difficulties, we conclude, is to deny intervention by tribes seeking to protect their treaty rights, and to deny any effect of recognition in any subsequent treaty litigation. That is the course we adopt.

## CONCLUSION

**[8]** The judgment of the district court denying the Rule 60(b) motion of the Samish Tribe for relief from the judgment in *Washington II* is affirmed. The conflict between *Washington III* and *Greene I* and *II* is resolved in favor of *Greene I* and *II*; *Washington III* is overruled.

**AFFIRMED.**